963 A.2d 409

COMMONWEALTH of Pennsylvania, Appellant

v.

Henry DANIELS, Appellee

Commonwealth of Pennsylvania, Appellee

v.

Henry Daniels, Appellant.

Commonwealth of Pennsylvania, Appellant

v.

Kevin Pelzer, Appellee.

Commonwealth of Pennsylvania, Appellee

v.

Kevin Pelzer, Appellant.

Supreme Court of Pennsylvania.

Submitted Oct. 24, 2006.

Decided Jan. 23, 2009.

Amy Zapp, Esq., PA Office of Attorney General, Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania (no. 410 CAP).

Paul M. George, Esq., McKinney & George, Philadelphia, for Henry Daniels (no. 410 CAP).

Paul M. George, Esq., McKinney & George, Philadelphia, for Henry Daniels (no. 411 CAP).

Amy Zapp, Esq., PA Office of Attorney General, Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania (no. 411 CAP).

Amy Zapp, Esq., PA Office of Attorney General, Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania (no. 413 CAP).

Stuart Brian Lev, Esq., Philadelphia, for Kevin Pelzer (no. 413 CAP).

Stuart Brian Lev, Esq., Defender Association of Philadelphia, Michael Wiseman, Esq., Matthew C. Lawry, Esq., Philadelphia, for Kevin Pelzer (no. 414 CAP).

Amy Zapp, Esq., PA Office of Attorney General, Hugh J. Burns, Jr., Esq., Philadelphia District Attorney's Office, for Commonwealth of Pennsylvania (no. 414 CAP).

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD, McCAFFERY and GREENSPAN, JJ.

## OPINION

Chief Justice CASTILLE.*

The Commonwealth appeals from the order of the Philadelphia County Court of Common Pleas granting appellees Henry Daniels and Kevin Pelzer relief on their petitions under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. By order dated March 25, 2003, the PCRA court granted both appellees relief on two claims, ordered a new trial, and denied the remaining claims. Appellees, acting as Cross–Appellants, have filed cross-appeals renewing the issues that the PCRA court dismissed. For the reasons set forth below, we vacate the order of the PCRA court and remand for further proceedings consistent with this Opinion.

On November 10, 1989, following a joint trial, a jury convicted appellees of first-degree murder, criminal conspiracy, kidnapping, robbery, and two counts of burglary. At trial, appellee Daniels was represented by Charles Houston, Esq., a South Carolina lawyer who was granted *pro hac vice* status. The trial court appointed John Drost, Esq., a Pennsylvania attorney, as back-up counsel. Appellee Pelzer was represented by Donald Padova, Esq.

The guilt phase of the trial established that appellees participated in a plan to kidnap and hold for ransom sixteen-year old Alexander Porter. Appellees kidnapped the victim, bound and gagged him, and placed him in the trunk of his car. Appellees then drove the victim's car to his mother's house and burglarized the dwelling. They also used the victim's key

* This case was reassigned to this author.

to burglarize his father's house. They left the victim in the trunk until nightfall when they set out to dispose of his body. At this point, the victim had been in the trunk for twenty-four hours. According to appellees' police statements and Daniels' trial testimony, when appellees went to dump the victim's body, they were unable to determine whether he was dead. Appellee Pelzer shot him four times in the back of the neck, removing all doubt.[1,2]

Following a penalty phase hearing, the jury found four aggravating circumstances and two mitigating circumstances with regard to both appellees. The four aggravating circumstances found were: (1) the victim was a prosecution witness to a murder or other felony; (2) the victim was being held for ransom or reward; (3) the offense was committed by means of torture; and (4) the defendant committed a killing while in perpetration of a felony.[3] The mitigating circumstances were that appellees had no significant history of prior criminal convictions and the "catchall" mitigator.[4] After weighing the aggravating and mitigating circumstances, the jury fixed the penalty at death for each appellee and the trial court imposed the sentences on November 14, 1989. *See* 42 Pa.C.S. § 9711(c)(1)(iv). In addition to the sentences of death, on April 23, 1990, the trial judge sentenced each appellee to an aggregate, consecutive term of twenty-five to fifty years in prison for the remaining crimes.

Appellees were represented by new counsel on direct appeal and this Court affirmed the judgments of sentence by an

1. There was some dispute about who was responsible for the shooting. While appellee Pelzer admitted to shooting the victim in his statement to the police, he stated he did so while appellee Daniels held a gun to his head. N.T., 10/30/1989, at 139. On the other hand, appellee Daniels claimed that appellee Pelzer did the shooting without coercion.

2. For a full rendition of the facts, *see Commonwealth v. Daniels*, 531 Pa. 210, 612 A.2d 395 (1992) (Opinion in Support of Affirmance) *Commonwealth v. Pelzer*, 531 Pa. 235, 612 A.2d 407 (1992) (Opinion in Support of Affirmance).

3. *See* 42 Pa.C.S. § 9711(d)(5), 42 Pa.C.S. § 9711(d)(3), 42 Pa.C.S. § 9711(d)(8), 42 Pa.C.S. § 9711(d)(6).

4. *See* 42 Pa.C.S. § 9711(e)(1) and 42 Pa.C.S. § 9711(e)(8).

equally divided Court in separate opinions.[5] The Court agreed that the jury's first-degree murder verdict should be sustained, but disagreed as to whether a new penalty phase was required, because three Justices did not believe that the evidence was sufficient to support the finding that the offense was committed by means of torture under 42 Pa.C.S. § 9711(d)(8). Additionally, two Justices did not agree that the evidence was sufficient to support the finding that the Commonwealth established the aggravating circumstance of killing a prosecution witness to prevent his testimony, 42 Pa.C.S. § 9711(d)(5). *See Commonwealth v. Daniels*, 531 Pa. 210, 612 A.2d 395 (1992); *Commonwealth v. Pelzer*, 531 Pa. 235, 612 A.2d 407 (1992). This Court then granted appellee Daniels' Petition for Reargument and affirmed the judgment of sentence in a Majority opinion. *Commonwealth v. Daniels*, 537 Pa. 464, 644 A.2d 1175 (1994).[6] Appellees did not petition for a writ of certiorari in the United States Supreme Court.

On January 10, 1997, appellee Pelzer filed a timely *pro se* PCRA petition. *See* 42 Pa.C.S. § 9545(b); *Commonwealth v. Fenati*, 561 Pa. 106, 748 A.2d 205 (2000) (exception exists to PCRA's one-year time requirement for those petitioners whose judgments had become final before 1995 amendments to the PCRA, who were filing their first PCRA petition, so long as petition was filed within one year of effective date of amendments). Appellee Daniels followed suit and filed a timely *pro se* PCRA petition on January 16, 1997. New counsel entered their appearances and filed amended petitions, which were followed by many supplemental petitions. The PCRA petitions were assigned to the Honorable James A. Line-

5. Justice Papadakos did not participate in the consideration or decision of the cases and thus the Court considering these cases consisted of six Justices.

6. The Majority opinion did not enumerate what issue or issues compelled reconsideration. In the opinion, the Court addressed the sufficiency of the evidence supporting the first-degree murder verdict, the two penalty phase issues that were the source of disagreement the first time, as well as appellee Daniels' challenge to the aggravating circumstance that the victim was being held for ransom or reward, 42 Pa.C.S. § 9711(d)(3).

berger.[7]

On February 2, 2000, the PCRA court held a hearing at which it reviewed the twenty-one claims submitted by appellees. The court granted an evidentiary hearing as to seven of the claims and granted the Commonwealth's Motion to Dismiss the remaining claims. The seven issues that were the subject of the evidentiary hearing were: (1) trial counsels' ineffectiveness for failing to object to the trial court's instruction on accomplice liability,(2) trial counsels' ineffectiveness for failing to adequately investigate and present evidence on the cause of death, (3) a challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), (4) trial counsels' failure to present mitigating evidence, (5) allegations related to appellate counsels' conduct, (6) a general request regarding the application of relaxed waiver, and (7) appellee Daniels' challenge to the aggravating circumstance, 42 Pa.C.S. § 9711(d)(6) under *Commonwealth v. Lassiter*, 554 Pa. 586, 722 A.2d 657 (1998) (plurality). *See* N.T., 2/2/2000, at 80–89.

After holding hearings on the PCRA claims in December of 2001, May of 2002, and January of 2003, the PCRA court granted relief in the form of a new trial at a brief hearing on January 29, 2003. In granting relief, Judge Lineberger explained that he was persuaded by two of appellees' claims alleging trial counsels' ineffectiveness: first, for failing to object to the trial court's instruction on accomplice liability, and second, for failing to present evidence related to the cause of death.

Subsequently, on February 28, 2003, the Commonwealth submitted a Rule to Show Cause seeking clarification of the January 29th order to ensure that it was a final, appealable order. The Commonwealth's concern was that Judge Lineberger's order did not encompass all of the claims raised by the PCRA petitions. On that day, however, Judge Lineberger was unavailable, and therefore, the appropriate supervising Judge of the Criminal Division, the Honorable D. Webster

7. The Honorable Albert F. Sabo was the trial judge, but he was no longer on the bench at the time the PCRA petitions were assigned.

Keogh, considered the Commonwealth's request. Judge Keogh granted the Rule, as follows:

AND NOW, this 28th day of February 2003, on consideration of the Commonwealth's proposed Order clarifying the order of the Court, the above defendant is directed to show cause why the Court should not issue an Order clarifying the ruling on defendants' PCRA petition claims.

This show cause hearing is listed for the 5th day of March, 2003, in Courtroom 701, at 9:30 a.m. Pending consideration of the Commonwealth's proposed order, the Court's Order of January 29, 2003, is hereby vacated.

As provided for by Judge Keogh's order, Judge Lineberger held a hearing on March 5, 2003. Following the March 5th hearing, Judge Lineberger granted the Commonwealth's requested clarification, and on March 25, 2003, he entered an order which again granted appellees relief on their joint claims of trial counsel ineffectiveness, but denied the remaining claims.

The Commonwealth filed a Notice of Appeal with this Court on April 24, 2003, challenging the PCRA court's order to the extent it granted relief. Appellees filed protective cross-appeals shortly thereafter to preserve their other claims. The PCRA court then issued an opinion in support of its order on June 29, 2004.

Meanwhile, appellees filed a Motion to Quash the Appeal by the Commonwealth, arguing that it was untimely. This Court issued an order dated December 8, 2003, deferring the quashal request and directing the parties to brief the issue of whether the Commonwealth's appeal should be quashed as untimely and whether the trial court had the authority under 42 Pa.C.S. § 5505 to issue a rule to show cause to modify or rescind an order within thirty days after its entry.

Before turning to the merits of the PCRA claims, we will address the procedural question that we directed the parties to brief. Appellees argue that the notice of appeal was untimely because the Commonwealth had to appeal within thirty days of the PCRA court's order dated January 29, 2003,

but did not. According to appellees, the January 29th order was a final order because it granted relief in the form of a new trial. Additionally, appellees aver that the time for taking the appeal was not extended because the Commonwealth's February 28th request to Judge Keogh regarding the Rule to Show Cause was *ex parte*. Appellees argue that *ex parte* proceedings are prohibited by the rules of ethics, judicial conduct, and case law. Moreover, appellees submit, the order was a nullity because it did not comply with the requirements of 42 Pa.C.S. § 5505, which expressly requires notice to the parties. Appellees also assert that Judge Keogh's order impermissibly expanded the Commonwealth's time for taking an appeal when the law clearly provides that the time for taking an appeal may not be extended as a matter of grace or indulgence. Appellees intimate that the Commonwealth's conduct in waiting until the final day of the appeal period somehow was underhanded and in bad faith. Appellees conclude that Judge Keogh's February 28th order was a nullity, and therefore the Commonwealth had to appeal within thirty days of the January 29th order. The Commonwealth did not do so, and thus, appellees argue that the appeal filed on April 24, 2003 was untimely.

The Commonwealth responds that the January 29th order was not a final order because it did not dispose of all pending claims and, in any event, the interlocutory order was properly vacated on February 28, 2003. The Commonwealth further notes that Section 5505 of the Judicial Code gives the trial court the authority to modify or rescind an order within 30 days after its entry provided no appeal has been taken. In this case, the Commonwealth was merely seeking a ruling as to why the January 29th order should not be modified within 30 days. The Commonwealth argues that Section 5505, which gives the court the power to modify or rescind an order, must include the lesser power to issue a rule to show cause why such modification or rescission is improper. Thus, in the Commonwealth's view, Judge Keogh's order vacating the earlier order extinguished any deadline related to the January 29th order.

Although the parties expend advocacy wrestling over whether the January 29th order was "final," we believe that the salient threshold inquiry centers on the validity of the February 28th order vacating the January 29th order. This is so because the question whether the January 29th order was "final" for purposes of appeal becomes irrelevant if the order was properly vacated by Judge Keogh on February 28th.[8] Thus, our analysis will begin with that question.

■ The answer to the question can be found in 42 Pa.C.S. § 5505. Generally, the interpretation of a statute is a question of law and our scope of review is plenary. *Gardner v. WCAB (Genesis Health Ventures)*, 585 Pa. 366, 888 A.2d 758, 761 n. 4 (2005). It is well-settled that the plain language of the statute is the best indicator of the Legislature's intent. 1 Pa.C.S. § 1921. A court should resort to other considerations, such as the General Assembly's purpose in enacting a statute, only when the words of a statute are ambiguous. 1 Pa.C.S. § 1921(c).

Section 5505 provides for the modification of orders and states,

Except as otherwise provided or prescribed by law, a court upon notice to the parties may modify or rescind any order within 30 days after its entry, notwithstanding the prior termination of any term of court, if no appeal from such order has been taken or allowed.

42 Pa.C.S. § 5505. The plain language of Section 5505 allows the trial court 30 days to modify or rescind a prior order when no appeal has been taken.

■ In this case, there was no appeal pending at the time the Commonwealth filed the Rule to Show Cause. Judge Keogh vacated the January 29th order for the limited purpose of allowing for a determination of whether the earlier order needed to be clarified. This action fell within the ambit of

8. The finality of the January 29th order would be the primary concern if there was a question of whether the Commonwealth filed the request for clarification after the 30 days provided for by Section 5505. As that is not at issue, we need not determine whether the January 29th order was final.

Section 5505. Therefore, Judge Keogh, as a member of the Court of Common Pleas of Philadelphia County, and as Supervising Judge of the Criminal Division, plainly had authority to vacate the January 29th order under Section 5505 in the absence of Judge Lineberger.

■ Appellees' specific complaint, however, also encompasses whether Judge Keogh could step into the process in lieu of Judge Lineberger and whether Judge Keogh's show cause order was a nullity because appellees were not given prior notice and the February 28th proceedings were, in appellees' view, *ex parte*.

The facts establish that on the day in question, February 28th, Judge Lineberger was unavailable because he remained at his home in reliance on a winter storm weather report that later turned out to be erroneous. Faced with the absence of Judge Lineberger, the Commonwealth sought an order from the proper administrative judicial officer in Philadelphia, the Supervising Judge of the Trial Division—Criminal, Judge Keogh. The Commonwealth's conduct was not indicative of forum shopping, but rather was necessitated simply by Judge Lineberger's unexpected absence. Administrative judges in multi-judge counties routinely enter such orders—which amount to status orders—in circumstances where the assigned judge is unavailable. Furthermore, it is worth noting that at the March 5th hearing, Judge Lineberger specifically found that the Commonwealth's February 28th request was made in "good faith." *Id.* at 10. Thus, there is simply no support for appellees' argument that Judge Keogh lacked authority to issue the February 28th order or that the Commonwealth was acting underhandedly when, in the absence of the assigned judge, it applied to the supervising judge for the Rule to Show Cause.

Likewise, the fact that appellees were not given prior notice of the filing did not render Judge Keogh's order a nullity. Section 5505 states only that the action should be taken "upon notice" to the parties. The statute does not state that notice must be given *prior* to the proceedings or the order is

rendered a nullity. *See, e.g., In re Upset Price Tax Sale,* 150 Pa.Cmwlth. 191, 615 A.2d 870, 872 (1992); *Commonwealth v. Allen,* 394 Pa.Super. 127, 575 A.2d 131, 133 (1990). And, while there are some circumstances when prior notice may be necessary,[9] the limited procedural circumstances for which Section 5505 was being invoked in this case did not demand prior notice. Again, appellees overlook the modest effect of Judge Keogh's February 28th order. The order did not modify or alter the January 29th order, but it merely maintained the status quo until Judge Lineberger was available to decide whether the earlier order was in need of clarification or modification. Since appellees were present **and heard** at the March 5th hearing, and it was only after that hearing that Judge Lineberger concluded that the January 29th order indeed was in need of clarification, the notice requirement was satisfied. *See, e.g., Commonwealth v. Fanelli,* 292 Pa.Super. 100, 436 A.2d 1024, 1026 n. 4 (1981).

Additionally, if we were to agree with appellee that the absence of prior notice under the present circumstances renders the order a nullity, we would ignore the reality that requests for a rule to show cause are commonly made *"ex parte"* precisely because the order granting the rule has the limited effect of directing the party to appear for a hearing at some later date in order to be heard as to why a certain action should not be taken. *See Commonwealth ex rel. Zimmerman v. Auto Mart, Inc.,* 910 A.2d 171, 176 (Pa.Cmwlth.2006); *In re Tax Claim Bureau of Lehigh County Sale No. 49–28,* 702 A.2d 1105, 1107 (Pa.Cmwlth.1997). This is precisely what occurred in this case. Accordingly, Judge Keogh acted within his authority on February 28th when he granted the Rule and vacated the prior order for the limited purpose of maintaining the status quo until Judge Lineberger could hear the parties' arguments. Furthermore, it was not until after hearing the parties on March 5th that Judge Lineberger concluded that the Commonwealth's argument that the January 29th order

---

**9.** *See Commonwealth v. Colding,* 482 Pa. 112, 393 A.2d 404, 405 n. 2 (1978) providing that reconsideration of a sentence should only occur following notice to all parties and an opportunity to be heard.

needed clarification was correct and issued a new, substantive order on March 25, 2003.[10] For these reasons, the March 25th order was the final appealable order and the Commonwealth's appeal, filed on April 24, 2003, was timely.

We now turn to the substance of the PCRA challenges. In order to be eligible for relief, a PCRA petitioner must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found in 42 Pa.C.S. § 9543(a)(2) and that the allegation of error has not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). A claim is previously litigated under the PCRA if the highest appellate court in which the petitioner would have had review as a matter of right has ruled on the merits of the issue. 42 Pa.C.S. § 9544(a)(2). An allegation is deemed waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post-conviction proceeding." 42 Pa.C.S. § 9544(b). This case involves "layered" ineffectiveness claims, as both appellees were represented by new lawyers on direct appeal. The Commonwealth challenges appellees' claims on waiver grounds because they could have been raised on direct appeal, or, alternatively, because they are not properly layered.

 It is well-settled that a petitioner can obtain relief on an ineffective assistance of counsel claim only if he demonstrates that counsel's performance was deficient and that the deficiencies prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Pennsylvania, we have applied the *Strickland* test by looking to three elements. Thus, in order to succeed on a claim of ineffectiveness, the petitioner must establish that the claim is of arguable merit, no reasonable trial strategy existed for counsel's action or inaction, and the outcome of the proceedings would have been different but for counsel's failures.

**10.** This Court is well aware of the difficulty posed in collateral capital appeals where the court fails to dispose of all claims, thereby raising the prospect of piecemeal review and unnecessary delays. The Commonwealth's request involved an important procedural issue in this area.

*Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness. *Commonwealth v. Sneed,* 587 Pa. 318, 899 A.2d 1067, 1076 (2006).

In *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003), this Court clarified the procedure to be followed in forwarding a PCRA claim challenging the effectiveness of all prior counsel, including prior direct appeal counsel, i.e., a "layered" claim of ineffectiveness. PCRA layering is necessary when the petitioner was represented by new counsel on direct appeal because claims bottomed upon trial counsel ineffectiveness—in particular, record-based claims—could have been raised on direct appeal.[11] In such circumstances, any claim that a petitioner would forward sounding in trial counsel ineffectiveness would be waived under 42 Pa.C.S. § 9544(b). *McGill* explicitly stated that "in order for a petitioner to properly raise and prevail on a layered ineffectiveness claim, sufficient to warrant relief if meritorious, he must **plead, present,** and **prove**" the ineffectiveness of direct appeal counsel, which necessarily related back to the actions of prior counsel. *McGill,* 832 A.2d at 1022 (emphasis in original). To "prove" that a layered claim of appellate counsel's ineffectiveness has arguable merit, the petitioner must develop and prove all three prongs of the *Pierce* test as to the ineffectiveness of trial counsel. *Id.*

As stated by *McGill,* a remand may be necessary to allow the petitioner an opportunity to correct any deficiencies

11. Until 2002, this Court required new counsel to raise claims of previous counsel's ineffectiveness at the first opportunity after new counsel is appointed, which was commonly on direct appeal. *Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977). This rule was subsequently abrogated in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), *reargument denied,* 573 Pa. 141, 821 A.2d 1246 (2003), which held that claims of ineffective assistance of counsel generally should be deferred until collateral review. 813 A.2d at 728 (overruling *Hubbard* ). *See also Commonwealth v. Pagan,* 950 A.2d 270, 287 (Pa.2008). Nevertheless, for direct appeals occurring prior to *Grant,* new direct appeal counsel would have been obligated to raise claims of trial counsel ineffectiveness or risk having them be dismissed as waived for purposes of collateral review.

in the pleading and presentation of his claims of appellate counsel ineffectiveness when the petitioner has properly pled, presented, and proved the underlying issue of trial counsel ineffectiveness, but failed to develop the layered claim respecting appellate counsel, without being put on notice by the PCRA court to address the deficiency. *Id.; see also Commonwealth v. Washington*, 583 Pa. 566, 880 A.2d 536, 540 (2005); *Commonwealth v. Williams*, 581 Pa. 57, 863 A.2d 505, 513 (2004). A remand is unnecessary, however, when the petitioner fails to plead all three prongs of the *Pierce* test related to trial counsel's ineffectiveness or fails to prove any prong with respect to trial counsel's ineffectiveness. This is so because that essential failure renders the petitioner unable to establish the arguable merit prong of his layered claim of appellate counsel's ineffectiveness. *Commonwealth v. Rush*, 576 Pa. 3, 838 A.2d 651, 657 (2003).

In this case, appellees were both represented by new counsel for purposes of direct appeal; thus, all claims deriving from the alleged ineffectiveness of trial counsel must be layered and must comply with *McGill.* To the extent that this Opinion discusses underlying (and waived) claims of alleged trial court error or trial counsel ineffectiveness, it does so purely for purposes of reviewing appellees' derivative and cognizable claims of layered ineffectiveness.

Having laid the framework for our analysis, we first address the Commonwealth's argument that appellees' claims are waived because they could have been raised at an earlier time in the proceedings and because they have forwarded mere boilerplate allegations of appellate counsel ineffectiveness. The original petitions in these matters were filed in 1997, long before *McGill.* While appellees filed numerous amendments to their original petitions, it was not until our decision in *McGill* that this Court offered a clear framework for analyzing PCRA claims when multiple, prior counsel were involved. *See Commonwealth v. Dennis*, 950 A.2d 945, 954–55 (Pa.2008) (discussing this Court's attempts to achieve consensus for framework when pleading layered claims). Indeed, consistent with the guidance expressed in *McGill,* the Commonwealth

includes a footnote acknowledging the unsettled state of the law at the time appellees were pursuing post-conviction relief when it states that this Court has "indicated that in cases pending on appeal when *McGill* was decided, remand may be appropriate to allow defendants who have failed to develop layered claims an opportunity to do so." Commonwealth's Brief as Appellant at 41; *see also Dennis*, 950 A.2d at 955 ("Our prior failure to achieve consensus, however, led us to afford courts and counsel in cases pending PCRA disposition or appeal an avenue to conform their pleadings to the newly clarified requirements."). Nevertheless, the Commonwealth then argues that a remand is inappropriate here because the underlying claims are meritless.

In light of the fact that appellees' post-conviction petitions were ruled upon prior to this Court's decision in *McGill*, the Commonwealth's waiver argument must fail to the extent it challenges appellees' failure to properly "layer" the claims. Rather, the Commonwealth's argument regarding the merits, or lack thereof, of the underlying issues provides the appropriate starting point for our analysis and it is to the substantive merits of the claims on which the PCRA court granted appellees a new trial that we now turn.[12]

The first claim involves appellees' allegations that their trial counsel were ineffective for failing to adequately investigate and challenge the Commonwealth's theory of the cause of the victim's death. The basis for the challenge relates to the victim's condition at the time that appellee Pelzer shot him. Appellees' position in their respective PCRA petitions was that defense counsel should have investigated and presented evidence challenging the Commonwealth's expert as to cause of death, because it was clear that the victim was dead at the time they shot him. According to appellees, such evidence would have supported a second-degree murder verdict instead of a first-degree murder verdict.

12. Of course, the Commonwealth's waiver argument would have validity to the extent that appellees failed to develop the claims of trial counsel's ineffectiveness under *Pierce*. *See Rush, supra.* Regarding the three claims addressed herein, however, that failure is not an issue.

At trial, the Commonwealth's forensic expert, Dr. Paul J. Hoyer from the Philadelphia Medical Examiner's Office, testified that the cause of the victim's death was four gunshot wounds with a contributory condition being ligature strangulation. Dr. Hoyer supported his opinion with evidence that the gunshot wounds were inflicted at a time when the victim was alive. Moreover, Dr. Hoyer noted there was a sock around the victim's neck and a number of small hemorrhages (petechial hemorrhages) in the left eye evidencing strangulation. N.T., 10/24/1989, at 94, 104–06, 112, 154.

On cross-examination, defense counsel questioned Dr. Hoyer extensively regarding whether strangulation or suffocation could have been the primary cause of death. Dr. Hoyer rejected such theories adhering to his original opinion that the primary cause of death was due to the gunshot wounds and rejecting outright the theory that suffocation could have caused the victim's death. Furthermore, Dr. Hoyer opined that the victim could have stopped breathing as a result of strangulation, but his heart was still pumping at the time he was shot. *Id.* at 117, 118, 123, 124, 128, 145–48.

Subsequently, appellee Daniels' counsel called Dr. Hoyer in support of the defense. The summary of Dr. Hoyer's testimony for the defense was that the evidence was consistent with the gunshot wounds being inflicted after strangulation at a time when the deceased had stopped breathing, but his heart continued to beat, and that the injuries caused by strangulation alone were sufficient to cause his death. N.T., 11/6/1989, at 20–21.

Appellee Daniels also took the stand and testified that he and appellee Pelzer had bound the victim's hands, feet, and neck with a rope, put a sock in his mouth, and placed him in the trunk of the car. The rope was later removed from the victim's feet and neck so that it only bound his hands. The sock stayed in his mouth. Daniels stated that they placed milk crates and cushions in the trunk to keep the victim from moving around. When they opened the trunk the next morning, he shook the victim's leg to wake him, but the leg was "real stiff." Furthermore, Daniels claimed that he believed

the victim was dead at the time his co-conspirator fired the shots. N.T., 11/3/89, at 40–44.

At the PCRA hearing, appellees presented the testimony of their trial counsel[13] and appellate counsel, and two forensic experts, Dr. Jonathan Arden and Dr. Robert Catherman, in support of their contentions. In response, the Commonwealth presented the testimony of Dr. Bennett Preston, also a forensic expert.

Appellees' PCRA experts testified that the victim was dead at the time the gunshot wounds were inflicted. Both experts agreed that the cause of death was asphyxiation from either ligature strangulation or positional asphyxiation. Dr. Catherman based his opinion on the lack of "vital reaction associated with the gunshot wounds. By vital reaction I mean an indication that there was a functioning cardiovascular system, which is applied when a person is alive." Furthermore, Dr. Arden unequivocally stated that Dr. Hoyer's conclusion that the gunshot wounds were the cause of death was incorrect, because the gunshot wounds caused injury to soft tissue which would not necessarily be fatal. Rather, he testified that the gunshot wounds were inflicted postmortem, based upon the "remarkably little bleeding associated with [the wounds]" and indicated that the amount of bleeding observed was less than he would have expected if the wounds were inflicted prior to death. Both experts also suggested that Dr. Hoyer's report was lacking insofar as it did not mention the presence of rigor mortis or account for the body's position. Regarding the possibility that the victim was strangled, the experts rejected such a theory, testifying that the lack of petechial hemorrhages in both eyes (rather than just in the left eye) and the lack of physical evidence internally or on the surface of the neck indicated that the victim did not die of strangulation. N.T., 5/8/2002, at 12, 13, 19, 20, 29–31, 32–33, 41; N.T., 12/14/2001, at 13, 14, 17, 24, 27–29, 30–31, 34.

On cross-examination, Dr. Arden conceded that there was a "theoretical possibility" that the gunshot wounds were inflict-

13. Daniels presented the testimony of John Drost, Esq., his back-up trial counsel.

ed perimortem (at the time of death), but he then reiterated that his opinion, with a reasonable degree of medical certainty, was that the gunshot wounds were inflicted postmortem. He also conceded that it was not "absolutely impossible" that the findings were consistent with ligature strangulation, but stated that the presence of the petechial hemorrhages in only one eye was "at the very least atypical for a ligature strangulation." *Id.* at 65, 68–69, 75.

On cross-examination, Dr. Catherman admitted that at the time he initially reviewed the materials in 1997 he concluded that the cause of death was ligature strangulation. He did not adopt the positional asphyxia theory until he reviewed his notes the day before the PCRA hearing. The Commonwealth implied that Dr. Catherman changed his theory based upon his review of the report submitted by Dr. Arden, but he denied the suggestion. Dr. Catherman admitted that in his pre-hearing affidavit he had stated that there was "very minimal hemorrhage" associated with the gunshot wound, but explained that in his revised opinion, which he was giving on the witness stand, he believed it to "be a combination of postmortem discoloration and gravitational leakage or drainage, not vital reaction." He also stated that it was possible that Dr. Hoyer's opinion was correct, adding "anything is possible." *Id.* at 49–51, 57–58, 62.

John Drost, appellee Daniels' back-up trial counsel, recalled conversations with lead counsel, Attorney Houston, regarding the cause of death issue but could not recollect the substance of those conversations. Drost admitted that neither he nor Houston retained an independent medical examiner to review Dr. Hoyer's report and explained that he did not pursue the issue because he was there as back-up counsel. He stated that if he had information that the victim was dead at the time he was shot, he would have presented such information at trial. N.T., 12/12/2001, at 14–15, 34. Throughout his testimony, Drost stressed his opinion of the inadequacy of Houston's representation, but admitted that he did not raise his concerns with the trial judge or appellee Daniels. *See, e.g., id.* at 21 ("Mr. Houston was either incapable or unwilling to follow

advice."); 48–49; 50–51 ("I don't recall the exact words I said to [appellate counsel], but the thought was this was perhaps the worst single job of lawyering that I had ever seen."). When asked about the cause of death issue on cross-examination, he stated, "Word for word I can't recall my conversations with Mr. Houston. I will tell you one of the issues that I urged upon Mr. Houston was concerning the cause of death. More than that I can't give you a specific recollection." *Id.* at 58. Drost also testified that he did not contact any medical examiner or pathologist before Houston became involved in this case.

Following Drost's testimony, appellee Daniels presented the testimony of George H. Newman, Esq., his direct appeal counsel. Newman stated that at the time of the appeal, Attorney Houston did not respond to his requests for Daniels' file. He could not recall whether he gave any thought to the cause of death issue and stated that he did not have an independent medical examiner review the file. Newman repeatedly testified that he would have raised "the best issues that were of record" and would have had "no conscious intention to store things up. No. I'm not stockpiling issues for later." *Id.* at 87–88, 103, 108.

Donald Padova, Esq., appellee Pelzer's trial counsel, testified that he remembered there was a question of whether the victim was alive at the time he was shot and that he may have gleaned that information from appellees' statements that the body was stiff when they removed it from the trunk and the gunshots were fired. Furthermore, Padova admitted thinking that it was unusual that the victim's feet were sticking straight up in the air when he reviewed the photographs and that the condition of the victim's body raised a question "in my mind as to whether or not the individual was alive." Padova then stated that he had notes in his file that he received permission to hire an independent medical examiner and that he had a note, dated October 30, 1989 stating, "Dr. Segal confirms Hoyer." He did not recall the conversation with Dr. Segal or what documents he had provided to Dr. Segal, but offered that he would not have accepted anything Dr. Segal said without

giving him the postmortem reports. Padova acknowledged that he did not call Dr. Segal as a witness, but stated he would not have done so, since Dr. Segal agreed with Dr. Hoyer.

During cross-examination, in response to a question by the PCRA court, Padova stated that he remembered that defense counsel had met a number of times to discuss strategy, but that he could not recall whether they ever discussed hiring an independent medical examiner versus using Dr. Hoyer in support of their position. Finally, on re-direct, Mr. Padova stated that the court gave him $150 for the forensic expert, but that he was not sure whether Dr. Segal was ever paid. N.T., 5/10/2002, at 27, 29, 31, 32, 37, 82–84, 90.

Jeffrey Kolansky, Esq., appellee Pelzer's appellate counsel, testified that at the time of the direct appeal, he believed that he could not raise any issues that were not raised in post-trial motions. On cross-examination, he stated that he would have raised an issue that was "glaring" on the record and that he was familiar with Attorney Padova and did not recall seeing any instances of ineffectiveness when he reviewed the record. N.T., 5/9/2002, at 57–58, 69.

The Commonwealth offered the testimony of Dr. Preston to rebut appellees' PCRA experts. Dr. Preston confirmed the findings in Dr. Hoyer's report, but stated that Dr. Hoyer's report should have included some discussion regarding the body's position and rigor mortis, and that his conclusion, based upon the photographs alone, would have been that the body was moved after it was shot. N.T., 5/8/2002, at 110, 131.

At the conclusion of the PCRA hearing, the PCRA court orally granted a new trial on this claim. The PCRA court offered that the photographs of the crime scene clearly showed a body in which rigor mortis had set in. The court believed that appellees had established ineffective assistance of counsel for failing to challenge Dr. Hoyer's opinion based upon the expert testimony of Drs. Catherman and Arden. The PCRA court opined that the victim had expired as a result of the confinement in the trunk and that, therefore, his death was brought about by "an accidental act. The shooting

was a manifestation of specific intent, but it was a corpse."
N.T., 1/29/2003, at 8.

In its subsequent opinion, the PCRA court explained that the only evidence of the circumstances of the shooting came from the statements of appellees. In those statements, appellees claimed that the victim's body was cold and stiff when they removed it from the trunk and the position of the body showed that the body was in rigor mortis at the time it was dumped from the trunk. The PCRA court credited the testimony of Drs. Arden and Catherman and found that the testimony of Dr. Preston tended to support appellees' position on collateral attack, since he "admitted that Dr. Hoyer's autopsy report was incomplete and insufficient in that the medial [sic] findings concerning the position of the body and the presence of rigor mortis were not included in his report." PCRA court opinion, 6/28/2004, at 6–7. The PCRA court reiterated that even a cursory review of the photographs revealed that rigor mortis had set in at the time the body was dumped and trial counsel should have realized that the Commonwealth's theory of how the victim was killed was incorrect.

Turning to the ineffectiveness claims, the PCRA court then stated that Daniels' trial counsel was ineffective, since he failed to seek assistance from a qualified forensic pathologist who could challenge Dr. Hoyer's testimony and that this failure left counsel unprepared to conduct a meaningful cross-examination. Likewise, the court found that Pelzer's trial counsel was ineffective since, even though he obtained funds to hire an expert, those funds were inadequate, and, more importantly, counsel,

> candidly admitted that he did not know what, if any, information he had provided to Dr. Siegal [sic].[14] Counsel admitted that his interaction with Dr. Siegal may have been limited merely to a phone conversation. Counsel had no record that any materials were even sent to Dr. Siegal and most importantly, counsel had no record that Siegal had even seen the autopsy photos or was aware of the circum-

14. The PCRA court's opinion is the only place where Dr. Segal's name is spelled with an "i" before the "e."

stances of the case, including the position of the body and the existence of rigor mortis. Counsel's consultation with Dr. Siegal was clearly insufficient, in that he failed to provide him with all of the information necessary to allow him to give an informed opinion and therefore any opinion he received was cursory, superficial, incomplete and inadequate.

*Id.* at 8. The PCRA court also found both appellate lawyers ineffective, since Daniels' appellate counsel testified that he did not consider raising a cause of death issue or hiring a forensic expert to review the cause of death issue, and Pelzer's appellate counsel admitted to a mistaken belief that he was limited to raising only the issues that were preserved in posttrial motions on direct appeal. For these reasons, the PCRA court granted appellees a new trial.

On this appeal, the Commonwealth argues that the defense consulted a forensic expert, Dr. Segal, who confirmed Dr. Hoyer's evaluation of the case. In the Commonwealth's view, once trial counsel received that confirmation, trial counsel were not required to shop around for an expert who agreed with their theory of the case. According to the Commonwealth, Attorney Padova obviously shared this information respecting Dr. Segal with Attorney Houston, as the attorneys were working closely together and met to discuss legal strategy. Furthermore, under governing law, the PCRA court was required to presume that counsel furnished Dr. Segal with all relevant materials required for his review unless appellees showed otherwise. The Commonwealth also contends that the evidence fully supported the conclusion of Drs. Hoyer and Segal, since there was bleeding along the wound tracts caused by the bullets, showing that the victim was alive at the time of his death.

More importantly, according to the Commonwealth, regardless of the exact time or cause(s) of the victim's death, there was ample evidence offered at trial to establish that appellees intended to kill the victim. Thus, there was testimony that, prior to the events in question, appellees stated that they were going to have to kill the victim because "his father knew a lot

of people." Moreover, even assuming that the victim died due to asphyxiation, the circumstances surrounding—and causing—the asphyxiation showed an intent to kill. The crux of the Commonwealth's argument, thus, is that appellees cannot show that they were prejudiced by counsel's actions, since appellees by their own admissions harbored the specific intent to kill the victim before actually causing his death. Thus, it was clear that appellees were guilty of first-degree murder irrespective of the particular time or cause of death.

Appellees respond that this Court must accept the PCRA court's supported factual findings and determine if its legal conclusion, based upon those findings, is correct. Considered in that vein, appellees maintain, it should have been self-evident to any reasonably competent attorney that there was an issue related to the cause of death based upon appellees' statements to the police, which asserted that the victim had died in the trunk of the car, and the physical evidence at the scene, *i.e.*, the position of the victim's body at the time he was found and the lack of blood on or around the victim. Appellees point out that the PCRA court credited the opinion testimony of Drs. Catherman and Arden, which would have permitted the jury to find that the victim was dead at the time the shots were fired. Appellees assert that the testimony of Dr. Catherman tended to show that Dr. Hoyer's postmortem report was inadequate, since it failed to account for the position of the body or the presence of rigor mortis. Furthermore, in appellees' view, trial counsel were ineffective for failing to cross-examine Dr. Hoyer about the position of the body or the presence of rigor mortis and made no effort to suggest, on the basis of scientific evidence, that the gunshots were fired postmortem. Finally, appellees contend that their PCRA defense experts established that the gunshot wounds were inflicted postmortem or, "at a minimum," cast "grave doubt on the prosecution's theory of the case at trial, the evidence presented at trial as it pertains to the cause of death, and more particularly, to the appellee['s] intent." Brief of Appellee Daniels at 50.

Regarding Attorney Padova's efforts to secure funds to hire a forensic expert, appellee Daniels argues that merely supplying Dr. Segal with Dr. Hoyer's postmortem report would not have provided a sufficient basis for Segal's opinion, since neither the position of the body nor the existence of rigor mortis was mentioned in the report. Therefore, even presuming that Padova contacted Dr. Segal and gave him Dr. Hoyer's reports, Daniels argues that such actions were constitutionally deficient because counsel failed to provide him with the information that he needed to reach an informed opinion. Furthermore, Daniels contends that his trial counsel knew that this was an issue based upon pre-trial discussions he had with Mr. Drost, but counsel still did nothing. "Rather, he uncritically accepted Dr. Hoyer's erroneous conclusions regarding the cause of death and attempted, somehow, to argue that these conclusions were consistent with his defense." Brief of Appellee Daniels at 57. In other words, Daniels submits, even assuming that Pelzer's counsel did something to secure an expert review, that in no way changes the fact that his own trial counsel did nothing.

Appellee Pelzer points out that counsel in a capital case has a duty to investigate and prepare for the guilt phase of trial and complains that his trial counsel failed to do so adequately. Pelzer notes that trial counsel's goal was to create a reasonable doubt about whether he had acted with the intent to kill. Thus, counsel knew that the cause of the victim's death was an issue and even took steps to raise the cause of death issue, but failed to provide the expert he had contacted with crucial material and then limited his consultation to a short mid-trial phone call.

Appellees also assert that they were prejudiced by counsels' inactions, since it is legally impossible to murder a corpse, regardless of the shooter's intent. Furthermore, appellees argue that the Commonwealth's theory—that it does not matter how the victim was killed as long as appellees had the intent to kill at some time during the incident—is unsupported by the law. Indeed, appellees note, it is the jury that decides the questions of intent, guilt, and degree of guilt, and in this

case, that decision was based upon the Commonwealth's theory that the victim was alive at the time he was shot. Thus, appellees maintain, even assuming that the Commonwealth's argument is correct—that there was sufficient evidence of intent to kill based upon the strangulation theory—that determination should be left for the jury.

Finally, appellees urge that appellate counsel were ineffective. Appellee Daniels argues that his appellate counsel did not have a strategic basis for failing to raise the claim on direct appeal. Appellee Pelzer points out that his appellate counsel believed he was constrained by the issues raised in post-verdict motions and that appellate counsel's belief was wrong, since at the time appellate counsel entered the case, any claims of ineffective assistance of trial counsel were to be raised at the earliest point in the proceedings at which allegedly ineffective counsel was no longer representing the defendant. In this case, that time was at direct appeal.[15]

It is well-settled that counsel is presumed to be effective and the petitioner must meet every prong of the *Pierce* test discussed *supra* in order to overcome the presumption. *Commonwealth v. Gibson*, 951 A.2d 1110, 1118 n. 7 (Pa.2008). Furthermore, we need not reach every prong of the ineffectiveness test, if the petitioner fails to prove any one prong. *Id.* In order to establish prejudice, appellees must demonstrate that there is a reasonable probability that the outcome of the proceedings would have been different had counsel pursued the theory they now present. *Id.* at 1120. Finally, we review the PCRA court's findings of fact to determine whether they are supported by the record. *Commonwealth v. Sam*, 952 A.2d 565, 573 (Pa.2008). We review the PCRA court's conclusions of law to determine whether they are free from legal error. *Id.* Our scope of review is

15. At the time of appellees' direct appeal this Court required new counsel to raise claims of previous counsel's ineffectiveness at the first opportunity after new counsel is appointed. *See supra* n. 11. As the direct appeal in this case occurred long before this Court's *Grant* decision and as appellees had new counsel for purposes of appeal, direct appeal counsel was obligated to raise any issues of trial counsel's ineffectiveness under *Hubbard*.

limited to "the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party." *Id.*

For purposes of today's decision, we will assume that appellees proved that their trial lawyers' assistance was deficient to the extent that they failed to secure expert testimony from a pathologist along the lines of the opinions proffered, years later, in the PCRA proceeding. Our review of the issue leads us to conclude, however, that appellees did not establish *Strickland/Pierce* prejudice, *i.e.*, a reasonable probability that the outcome of the trial would have been different if only trial counsel had presented testimony, such as the PCRA testimony of Drs. Arden and Catherman, challenging the Commonwealth's theory as to the specific cause of death. In granting appellees relief, the PCRA court postulated that, "[i]f the jury concluded that the victim died before the shooting, as a result of being confined in the trunk of a car for many hours with a sock jammed into his mouth, depriving him of oxygen, **the proper verdict** would have been a finding of second degree murder." PCRA court Slip op. at 9 (emphasis supplied). The PCRA court's legal conclusion respecting prejudice was incorrect, since the law of first-degree murder requires only that the Commonwealth establish that the killing was intentional. *Commonwealth v. Treiber*, 582 Pa. 646, 874 A.2d 26, 30 (2005). That is, that the killing was willful, deliberate, and premeditated. *Id.*

In this case, the testimony of appellees' PCRA experts does not compel a finding that appellees did not intend to cause the victim's death. While there may be a question of whether appellees intended to cause his death by asphyxiating him in the trunk of the car, that in no way alters the fact that the evidence demonstrated that appellees' intended to kill the victim and their actions directly caused his death. Such a conclusion follows from the trial evidence that appellees had told individuals prior to the kidnapping and murder that they would have to kill the victim "because his father knew a lot of people." N.T., 10/31/89, at 118; *see also id.* at 91; N.T., 11/3/1989, at 37, 40 (appellee Daniels' testimony that there was

concern that victim's "father knew a lot of people" and of the victim's "father coming back"). Similarly, during the event itself, there was evidence that appellees announced that they intended to "get rid" of the victim. N.T., 10/30/89, at 91 ("One of the guys said, you know, we got to get rid of him because he knows my house"; "I told him that one of the guys was talking about getting rid of the boy"); 11/3/1989, at 36 ("somebody mentioned to shoot him"). Additionally, appellees' actions prior to shooting the victim spoke volumes concerning their shared intention. For instance, when appellees placed the teenaged victim in the trunk of the car, they bound his hands, neck, and feet, and put a sock in his mouth, which obviously compromised his ability to breathe. Appellees also surrounded the victim with cushions and milk crates, so that he could not move, and then left him in such confined circumstances for an extended period. The death resulting from such acts was a far cry from being "accidental." Indeed, the physical evidence showed that appellees attempted to kill the helpless victim in multiple ways, and the gunshot wounds—whether ultimately fatal or not—were the *coup de grâce,* demonstrating beyond question that appellees intended to kill the victim.

Moreover, it should be emphasized that the PCRA defense experts' opinions on the specific cause of death say little about appellees' intention—which was a very different question. Appellees were neither medical doctors nor pathologists. What could be the point in shooting the victim multiple times if not to make certain he was dead, in case their prior conduct had left his status in doubt? To suggest that the victim's death was the result of an "accidental act" or was the result of something less than intentional conduct because he may have died of asphyxiation—caused by appellees—rather than by strangulation or gunshot wounds—also inflicted by appellees—fails to acknowledge that appellees controlled the circumstances surrounding his death every step of the way and that those circumstances fully supported a finding of an intent to kill beyond a reasonable doubt. *See, e.g., Commonwealth v. Dupre,* 866 A.2d 1089 (Pa.Super.2005). Because they have not

proven *Strickland* prejudice, appellees' underlying claim of trial counsel ineffectiveness fails, and thus their cognizable derivative claim concerning appellate counsel necessarily fails. Accordingly, we reverse the PCRA court's grant of a new trial on this basis.

■■■ Having concluded that trial counsel were not ineffective for failing to pursue an alternative cause of death theory, we now turn to the other basis upon which the PCRA court granted a new trial—that trial counsel were ineffective in failing to challenge the trial court's intent to kill instructions on grounds that the court did not adequately inform the jury regarding accomplice liability, thereby violating this Court's later decision in *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994).

The PCRA court found that the following instruction was erroneous because it did not inform the jury that an accomplice can only be liable for first-degree murder if he shares the same intent as the principal:

> Thus, in order to find a Defendant guilty of murder of the first degree, you must find that the Defendant caused the death of another person or that an accomplice or co-conspirator caused the death of another person. That is, you must find that the Defendant's act or an accomplice's or co-conspirator's act is the legal cause of the death of [the victim] and thereafter you must determine if the killing was intentional.

N.T., 11/9/1989, at 44. The PCRA court concluded that the instruction was incomplete and inadequate because it failed to clarify that the Commonwealth must establish beyond a reasonable doubt that an accomplice to a murder must possess the specific intent to kill in order to be convicted of first-degree murder. The PCRA court further held that the court's erroneous instruction was "highly prejudicial" to both appellees and trial counsel were ineffective for failing to object to the instruction or request a curative instruction. Similarly, the court found that appellate counsel were ineffective for failing to raise the issue on direct appeal. In its analysis, the

PCRA court did not examine the principal/accomplice relationship between the appellees, and thus drew no distinction premised upon the evidence respecting the role each played in the murder.

Preliminarily, we note that this is an ineffectiveness claim and *Strickland* requires that we assess counsel's performance under the law in existence at the time counsel acted. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. *Huffman* did not exist at the time of trial, yet it was the only case relied on by the PCRA court in granting appellees' relief. Notably absent from the PCRA court's opinion is an acknowledgement that *Huffman*, on its own, could not provide a basis for finding counsel ineffective. Counsel clearly cannot be faulted for failing to raise a *Huffman* objection at trial because *Huffman* did not exist.

Nevertheless, for purposes of our decision today, we will assume that a *Huffman*-type objection was available to reasonably competent counsel.[16] Indeed, at least one other law-

16. While *Huffman* was the first case to state unequivocally that a jury instruction was inaccurate if the jury was told that it could find the defendant guilty of first-degree murder if either he **or** his co-conspirator possessed specific intent to kill at the time of the murder, the holding in *Huffman* was based, in relevant part, upon this Court's decision in *Commonwealth v. Bachert*, 499 Pa. 398, 453 A.2d 931 (1982), a case involving a sufficiency of the evidence challenge in an accomplice liability scenario. In addressing the sufficiency claim, the *Bachert* Court noted that, "[t]o determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his state of mind; the requisite mental state must be proved beyond a reasonable doubt to be one which the accomplice harbored and cannot depend upon proof of the intent to kill only in the principal." *Huffman*, 638 A.2d at 962 *quoting Bachert*, 453 A.2d at 935. The decision in *Huffman* relied on this language to conclude that a jury instruction was erroneous if it allowed a jury to convict a defendant of first-degree murder without a finding that he personally possessed the requisite mental state—specific intent to kill. *Huffman*, 638 A.2d at 963.

Additionally, at the time of appellees' trial, Section 306(d) of the Crimes Code described the culpability of an accomplice as follows:

yer forwarded such an argument prior to the effective date of *Huffman*, albeit the argument was rejected by this Court after examining the charge in its entirety. *See Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1384 (1991).

It is well-settled that when reviewing the adequacy of a jury instruction, we must consider the charge in its entirety to determine if it is fair and complete. *Commonwealth v. Cooper*, 596 Pa. 119, 941 A.2d 655, 669 (2007); *Commonwealth v. Murphy*, 559 Pa. 71, 739 A.2d 141, 146 (1999); *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704, 709 (1992); *Commonwealth v. Prosdocimo*, 525 Pa. 147, 578 A.2d 1273 (1990). The trial court has broad discretion in phrasing the charge and the instruction will not be found in error if, taken as a whole, it adequately and accurately set forth the applicable law. *Prosdocimo, supra.* This was the governing precedent prior to *Huffman* and was followed in cases immediately thereafter. *See Commonwealth v. Thompson*, 543 Pa. 634, 674 A.2d 217 (1996); *Chester, supra.*

A more recent case from this Court provides the answer to the question before us today. In *Commonwealth v. Speight*, 578 Pa. 520, 854 A.2d 450 (2004), we examined a similar *Huffman* challenge. *Speight* first set forth the objected-to charge, which provided as follows:

> Now, murder of the first degree, members of the jury, is a criminal homicide committed with a specific intent to kill.... Now, if you believe that the defendant or his accomplices or co-conspirators intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which *you may infer that the defendant had the specific intent to kill.*

(d) Culpability of accomplice.—When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, *if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.*
18 Pa.C.S.A. § 306(d) (emphasis added). "Thus, to be convicted as an accomplice, a person must act with the requisite *mens rea*, for example, in the case of third-degree murder, with malice." *See Commonwealth v. Flanagan*, 578 Pa. 587, 854 A.2d 489, 501 (2004). And, in the case of first-degree murder, a person must act with the specific intent to kill.

854 A.2d at 460 (emphasis in the original). We acknowledged that the charge, "like the one given in *Huffman,* could allow the jury to reach a first-degree murder verdict without finding appellant had the requisite intent to commit the crime; the jury could have been misled into thinking they could convict appellant of murder in the first-degree if his accomplice or co-conspirator had specific intent to kill." *Speight,* 854 A.2d at 460. Nevertheless, the Court did not end the analysis at that juncture, but turned to the well-settled principle noted herein that the charge must be taken as a whole "and an error cannot be predicated on an isolated excerpt." *Id.quoting Thompson, supra.* We then considered the accomplice and co-conspirator liability charges, which we determined accurately reflected the law. After reviewing the charge in its entirety, we concluded that, read as a whole, the charge sufficiently instructed the jury regarding the requirement that an individual must possess the specific intent to kill in order to be convicted of first-degree murder. *Id.* at 461.

As *Speight* makes clear, when reviewing *Huffman*-type challenges, courts must follow the well-settled requirement that the challenged jury charge is to be examined in its entirety. Such an examination includes reviewing the charge to determine whether the jury was adequately apprised of the elements of first-degree murder and the related concept of specific intent to kill.

Applying this framework to this case, the PCRA court's legal conclusion that the charge was defective plainly was erroneous as it failed to consider the charge as a whole. As in *Speight,* the excerpt quoted by the PCRA court was problematic if viewed in isolation, since it was nearly identical to the instruction found to be inaccurate in *Huffman.* The excerpt highlighted by the PCRA court, however, was not the only part of the charge concerning accomplice liability and first-degree murder. Earlier in its charge, the trial court correctly instructed the jury on accomplice liability, explaining,

Under the law of Pennsylvania you may find a Defendant guilty of a crime without finding that he personally engaged in the conduct required for commission of that crime or

even that he was personally present when the crime was committed. A Defendant is guilty of a crime if he is an accomplice of another person who commits that crime. A Defendant does not become an accomplice merely by being present at the scene or knowing about a crime. He is an accomplice if, with the intent of promoting or facilitating commission of the crime, he solicits, commands, encourages, requests the other person to commit it, or aids, agrees to aid, or attempts to aid the other person in planning of committing it.

N.T., 11/9/1989, at 32–33. Indeed, this instruction is virtually identical to the accomplice liability charge that we approved in *Speight.* The PCRA court failed to account for this portion of the charge.

The trial court then instructed the jury regarding homicide generally and explained that the Commonwealth had to prove "each and every essential element" of the crime beyond a reasonable doubt. *Id.* at 39. Then, the court specifically enumerated the elements of first-degree murder including the portion quoted by the PCRA court. Moreover, the trial court began the instruction regarding first-degree murder by explaining that it was an intentional killing:

Now, what is murder of the first degree? The Act of Assembly or statute under which the Defendant is being tried expressly defines what is murder of the first degree. This statute, which is known as the Crimes Code ... under Section 2502(a) of that Crimes Code provides verbatim or word-for-word as follows: "Murder of the first degree: A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing."

\* \* \* \*

The third basis upon which one may be found guilty of intentional killing under first degree murder is by any other kind of willful, deliberate and premeditated killing. Now, what is meant by these words, "willful," "deliberate" and "premeditated"? If an intention to kill exists, or if a killing was consciously done with knowledge of such consequences,

or if the killer consciously decided to kill the victim, the killing is willful. If this intent to kill is accompanied by such circumstances as evidence or demonstrate a mind fully conscious of its own purpose and design to kill, it is deliberate.... Our cases have consistently held that the requirement of premeditation and deliberation is met whenever there is a conscious purpose to bring about death....

Further, the required intention to kill may be found in the Defendant's acts, declarations, words or conduct, or by the circumstances under which the killing was accomplished.

*Id.* at 43–47.

Considering the instructions in their entirety, and not an excerpt in isolation, it is apparent that the trial court instructed the jury on accomplice liability consistently with this Court's case law. *See Speight, supra.* The offense here, as was made clear, was first-degree murder. Furthermore, the trial court instructed the jury that the defendant had to possess the specific intent to kill in order to be convicted of first-degree murder and then defined the term. Indeed, the instructions given by the trial court in this case were virtually identical to those we approved of in *Speight, supra* and similar to those in *Commonwealth v. Cox,* 581 Pa. 107, 863 A.2d 536 (2004). Accordingly, the PCRA court erred in failing to consider the trial court's instructions in their entirety, in finding trial and appeal counsel ineffective for failing to challenge the instructions, and in granting appellees a new trial on this issue.[17]

Having determined that the Commonwealth's appeal of the order granting a new trial is meritorious, we now turn to the issues raised in appellees' protective cross-appeals. Appellees renew a number of claims before this Court. The PCRA court rejected all but one of them without offering the basis for

17. In any event, the jury could have found that both actors were principals based upon the evidence presented, since the two men acted in concert throughout most of this prolonged incident until the time of the shooting. Furthermore, regarding the shooting itself, the evidence inculpated both men depending on whose version of the shooting the jury believed.

denial. As we explain below, we will remand those claims not addressed by the PCRA court.

The single claim raised by appellees which was addressed by the PCRA court on the merits was that the Commonwealth violated *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using its peremptory challenges in a racially discriminatory manner when selecting the jury.

The parties agree that during jury selection, the prosecutor struck fifteen African American and three white venire persons. Furthermore, the venire panel consisted of four African American jurors and ten white jurors (two were alternates).

At the PCRA hearing, appellees called Assistant District Attorney ("ADA") Edward Cameron, the trial prosecutor. After the list documenting the jurors' race and whether they served on the jury was entered into the record, ADA Cameron explained that he had reviewed the jury selection transcript and his handwritten notes from the trial in preparing to testify at the PCRA hearing. Appellee Pelzer's counsel then walked ADA Cameron through each of the jurors that were struck and ADA Cameron explained his reasoning for striking them. His testimony ran the gamut from explaining that he did not like social workers or school teachers on the jury, that he did not want jurors with children around the ages of the defendants, to that he did not like "dumb" jurors, "Jack and Jill" jurors from Chestnut Hill, or women that referred to themselves as "Ms." N.T., 12/13/2001, at 122–161; N.T., 12/17/2001, at 27–67.

Following the hearing, the PCRA court held that ADA Cameron had provided race neutral reasons for each of his strikes of potential African American jurors. Consequently, it found, neither trial counsel nor appellate counsel could be deemed ineffective for failing to raise a *Batson* challenge. PCRA court Slip op. at 11.

Appellees argue that trial counsel were ineffective to the extent they failed to properly raise and preserve a *Batson* challenge and appellate counsel were ineffective for failing to pursue the claim on direct appeal. (Alternatively, appellee

Pelzer attempts to demonstrate that the claim was preserved by trial counsel by pointing out that counsel made an objection and sought to raise the claim, but acknowledges that trial counsel may have failed to adequately raise and preserve it.) Turning to the substance of the claim, appellees contend that, contrary to the PCRA court's conclusions, the reasons ADA Cameron gave for striking African American jurors were not race neutral, but were pretextual. Appellees reach such a conclusion based upon what they believe is the pattern of the prosecutor's strikes (that African Americans comprised 41% of the panel, but were struck 83% of the time) [18]; that the jurors struck were the same race as appellees, and that the prosecutor's handwritten notes reflected the race of the jurors which, they speculate, shows that "race featured very prominently in his thought process." Brief of Appellee Pelzer at 84–85. Appellees then go through the jurors struck by the prosecutor individually, and argue why they feel the reasons given by ADA Cameron should have been found to be pretextual and not race neutral.

Appellees also set forth an independent claim related to the PCRA court's procedural handling of their *Batson*-based claim. According to appellees, the PCRA court unfairly limited the scope of the hearing to questioning ADA Cameron as to why he struck potential jurors, and prohibiting testimony as to his jury selection practices in other cases, whether he conformed his jury selection choices to the suggestions in the "McMahon video," [19] and the characteristics of the white jurors that he selected, which appellees say was in violation of

18. In projecting this number, appellees do not account for the inevitable effect on the "pattern" of strikes created by the defense exercise of strikes. In other words, particularly in multiple-defendant cases, if the defense strikes one race of jurors at a heightened rate, it would automatically reduce the number of jurors of that race available to the prosecution for strikes. Appellees do not discuss the nature of their own strikes and the effect those strikes had upon the Commonwealth's strikes; thus, their accounting is incomplete.

19. The McMahon video refers to a 1987 video of Philadelphia assistant district attorney, Jack McMahon, expressing his personal views on jury selection, which included advocating the use of certain discriminatory practices during jury selection. *See Commonwealth v. Marshall*, 596 Pa. 587, 947 A.2d 714, 718 (2008).

the United States Supreme Court's much later decision in *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

The Commonwealth frames this issue in its only cognizable form, *i.e.,* as one sounding in ineffective assistance of appellate counsel, and argues that appellate counsel was not ineffective for failing to raise trial counsel's ineffectiveness for not alleging a *Batson* violation. Furthermore, according to the Commonwealth, appellees have failed to establish a *prima facie* showing of a *Batson* violation. The Commonwealth supports its argument by noting that the prosecutor had two additional peremptory strikes remaining at the conclusion of voir dire, which he could have used to strike African American jurors, that four African American jurors were selected, and that there was nothing in the prosecutor's statements or conduct during voir dire establishing a *prima facie* case of discrimination. Alternatively, the Commonwealth offers that the prosecutor offered what the PCRA judge found to be credible, race-neutral explanations for the strikes, conclusively demonstrating that there was no purposeful discrimination.

Initially, it must be noted that there is some disagreement as to whether appellees preserved a *Batson* challenge at the trial level. The origin of the disagreement is that, during *voir dire,* appellee Pelzer's counsel, Attorney Padova, questioned the Commonwealth's practice of striking African American jurors. N.T., 10/20/1989, at 269. Counsel did not, however, specifically raise a *Batson* challenge, the trial court did not interpret the objection as raising a *Batson* challenge, and counsel did not press the issue. On the day that the objection was made, the trial court noted the race of the struck jurors on the record, but thereafter, did not continue to do so. *Id.* at 269, 287, and 308; N.T., 10/23/1989, at 36 ("I don't know whether the defense is still pushing on this, your use of peremptories, but just in case they are I want to put on the record that this juror, Janis Green, number 155, is a black woman."). From that point on, however, Attorney Padova did not renew an objection nor did he request that the race of many of the remaining struck jurors be placed on the record.

*See, e.g.,* N.T., 10/23/1989, at 102 (Queen Overton), 146 (Janis Brant), 193 (Lourdes Saldana). Accordingly, it appears that no *Batson* claim was raised and preserved at the trial level, and it is certain no such claim was pursued on appeal. Moreover, the bare-bones objection raised by Attorney Padova bears little resemblance to the claim that is now being pursued. Thus, the only cognizable claim before us is that related to trial and appellate counsel ineffectiveness.

▆▆▆▆ The High Court's 1986 *Batson* decision revolutionized jury selection processes by overruling prior case law and allowing an individual defendant to show that he was denied equal protection by the prosecutor's improper exercise of peremptory challenges in a racially discriminatory manner in his individual case. *Commonwealth v. Sneed,* 587 Pa. 318, 899 A.2d 1067 (2006). Under *Batson,* once the objecting party makes out a *prima facie* case of discrimination, the burden shifts to the striking party to provide a race-neutral explanation for the challenge. *Id.* At the time of appellees' trial, *Batson* was decided and it was incumbent upon counsel to raise and preserve any legitimate claim related to alleged discrimination in jury selection. As stated previously, counsel failed to press a claim under *Batson.* In such circumstances in which no contemporaneous *Batson* objection was raised at trial, this Court has stressed that the *Batson* framework does not apply. *See Commonwealth v. Uderra,* 580 Pa. 492, 862 A.2d 74, 87 (2004); *Commonwealth v. Jones,* 951 A.2d 294 (Pa.2008). Rather, "in order to succeed on an unpreserved claim of racial discrimination in jury selection … a post-conviction petitioner may not rely on a prima facie case under *Batson,* but must prove actual, purposeful discrimination by a preponderance of the evidence **in addition to all other requirements essential to overcome the waiver of the underlying claim.**" *Commonwealth v. Collins,* 957 A.2d 237, 259 (Pa.2008) (emphasis added), *quoting Uderra, supra.*

▆▆▆ In this case, because appellees' *Batson* claim was unpreserved at trial, they would have to meet the collateral standard noted in *Uderra* and followed in subsequent cases.

Appellees have not argued before this Court, much less attempted to prove, an entitlement to relief under *Uderra*. Rather, appellees urge this Court to reject that standard under *Holloway v. Horn*, 355 F.3d 707 (3d Cir.2004). We have reviewed such a request and declined to overrule *Uderra* on the basis of *Holloway*. *See Commonwealth v. Jones*, 951 A.2d 294, 300–01 (Pa.2008). And, notably, the Third Circuit has recently joined this Court and the majority of courts to consider the question and recognized that a contemporaneous objection is required in order to preserve a *Batson* issue for purposes of appeal. *See Abu–Jamal v. Horn*, 520 F.3d 272, 283–84 (3d Cir.2008). Accordingly, appellees' claim, which they would litigate as if it were preserved, fails for this reason alone. Furthermore, as the PCRA court credited ADA Cameron's testimony regarding the reasons for striking the African American jurors, appellees could not meet the *Uderra* standard even if they had properly framed and argued their collateral claim.

 Finally, appellees raise numerous other claims which, though dismissed by the PCRA court, were not addressed by the PCRA court on the merits either in its opinion or elsewhere on the record. For example, in its opinion, the PCRA court acknowledged that appellees raised other claims of error in connection with the penalty phase of the trial, but stated that those claims were rendered moot because of its decision to grant a new trial, and thus dismissed them. Given the prospect of appellate review, and to avoid piecemeal review, PCRA courts in capital cases should be thorough and should address all issues. In light of our disagreement with the PCRA court's existing grant of relief, the proper course is to remand for the PCRA court to address these claims.

In addition, the PCRA court failed to explain the basis for its determination that appellees' many other claims affecting the guilt phase were meritless. Because of the PCRA court's failure, we have no rationale supporting the denial of appellees' remaining claims and cannot conduct meaningful appellate review. Under such circumstances, we will remand the matter to the PCRA court to write an opinion addressing all of

the PCRA petitioner's claims. *See Commonwealth v. Fletcher*, 586 Pa. 527, 896 A.2d 508, 523 (2006) (remand necessary when PCRA court focused exclusively on one claim and failed to offer any rationale regarding appellee's remaining claims); *see also Commonwealth v. Dennis*, 950 A.2d 945, 979 (Pa. 2008); *Commonwealth v. Fulton*, 583 Pa. 65, 876 A.2d 342 (2002). Accordingly, we remand this matter to the PCRA court to furnish a written opinion on the remaining claims raised by appellees in their petitions for post-conviction relief, including those claims that it previously dismissed without a hearing. As to any claims requiring resolution of disputed material facts, the court should include specific factual findings and express credibility judgments.

The order of the PCRA court is vacated and the matter is remanded for further proceedings consistent with this Opinion. Jurisdiction is relinquished.

Justice GREENSPAN did not participate in the consideration or decision of this case.

Justice EAKIN and BAER, Justice TODD and Justice McCAFFERY join the opinion.

Justice SAYLOR files a concurring opinion.

Justice SAYLOR, concurring.

I join the majority opinion subject to the following reservations.

The majority indicates that requests for rules to show cause are commonly made *ex parte*. *See* Majority Opinion, *op.* at 418–19. I believe that, where reasonably practical, prior notice should be given to opposing parties, and thus, I would not endorse *ex parte* practice as normative.

Separately, I differ with the majority's conclusion that the jury charge, taken as a whole, satisfied the requirements of *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994). As I find this case to be on all fours with *Commonwealth v. Speight*, 578 Pa. 520, 854 A.2d 450 (2004), however, I join the majority's ultimate disposition of the jury-instruction claim

based upon precedent. *See generally Commonwealth v. Cox*, 581 Pa. 107, 149 n. 3, 863 A.2d 536, 561 n. 3 (2004) (Saylor, J., dissenting) (expressing the view that *Speight* implicitly overruled *Huffman* in these circumstances); *Commonwealth v. Jones*, 590 Pa. 202, 250, 912 A.2d 268, 297 (2006) (Saylor, J. concurring) ("[A]fter *Cox*, it seems to me that the only surviving vestige of *Huffman* is that which remains to be litigated in the federal courts under due process theory." (citing *Laird v. Horn*, 414 F.3d 419, 425–28 (3d Cir.2005))).