J-S32016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSE OLIVO-NOBLE | : | |
| | : | |
| Appellant | : | No. 1710 MDA 2017 |

Appeal from the PCRA Order October 3, 2017
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0000009-2012

BEFORE:   PANELLA, J., NICHOLS, J., and PLATT, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED OCTOBER 05, 2018**

Appellant Jose Olivo-Noble appeals from the order dismissing his first petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  Appellant raises claims of ineffectiveness of trial counsel[1] in failing to impeach witnesses and to call character witnesses.

We set forth the facts of this case in a previous memorandum:

Appellant's girlfriend was Jateeyia Thompson, and the victim in this case was Eric Gunraj (Victim).[2]  Victim often visited the home of his friends, the Freeman family, who lived across the street from Jateeyia's mother's house.  On Thanksgiving evening in 2011, Victim, along with his friends Leonard Davis and Larry Brickhouse, went to a pub.  Victim said hello to Appellant's girlfriend, Jateeyia, gave her a hug, and then touched or grabbed

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Larry Rosen, Esq., represented Appellant at trial.

[2] Victim was also referred to as Quincy.  *See* N.T., 12/6/12, at 55.

her buttocks. Appellant confronted Victim and hit him. They both left the bar, and outside, Appellant again approached Victim and hit him. At trial, Jateeyia testified that she had seen Victim around in the clubs for [about] a month before the incident. Appellant testified that he did not know Victim, but had seen him once in a while when he goes to Jateeyia's mother's house. Furthermore, at trial the Commonwealth played surveillance video showing both instances of Appellant hitting Victim.

Two nights later, around 5:00 or 6:00 p.m. on November 26, 2011, Appellant went to the house across the street from Jateeyia's mother's house, where Victim visited every day. Appellant approached Ms. Masai Freeman, a resident of the home, and asked if Victim was around. After being told he was not, Appellant told Masai to tell Victim he had stopped by, which Masai did by phone.

Later that night, into the early morning hours, Victim was on the front porch of the Freeman home, along with Tanisha Freeman— who is Masai's sister—and Leonard Davis. Jateeyia and her mother were at the mother's house across the street. Appellant

> approached the [Freeman] house from across the street, stopped at the bottom of the porch stairs and accused [Victim] of looking for [Appellant] as other men approached from the side of the porch. An argument ensued between [Victim] and [Appellant], in which Mr. Davis interjected "What are we arguing for. There's kids in the crib." Mr. Davis continued to intervene and stated "it's all you all against us. We can go in the alleyway and settle our differences." Meanwhile, [Victim] began pulling up his pants. [Appellant] warned [Victim] to stop reaching. Mr. Davis [told Victim to stop reaching] as well.
>
> Nevertheless, [Victim] persisted to pull at his pants, and [Appellant] drew his gun and began to shoot. Mr. Davis grabbed Tanisha Freeman and pushed her through the front door of the house. As Mr. Davis placed on[e] hand on [Victim] to grab him, he felt the shots hit [Victim's] body. Mr. Davis followed Tanisha in through the door as [Victim's] body dropped to the floor of the porch. After the first round of shots, Tanisha turned toward the direction [Appellant] had run and shouted, "you're going to jail, you're going to jail, you shot him, I am calling the cops you fat expletive, you're going to jail, you're going to jail." While shouting,

- 2 -

> Tanisha looked out of the house and saw [Appellant] back up [and] shoot a second round of shots into the house. Two of the bullets from the second volley struck Ms. Oveta Johnson in the buttocks as she ran to call the police. [Johnson is Masai and Tanisha's mother and was inside the house. Victim] died on the porch shortly after the shooting.
>
> [Victim] was not in possession of a gun.

*Commonwealth v. Olivo-Noble*, 1112 MDA 2013, 1-3 (Pa. Super. filed Dec. 22, 2014) (citations, footnotes, ellipses, and some internal quotation marks omitted).

At trial, trial counsel called Shirley Thompson, Jeanette Thompson, and Jateeyia Thompson, who testified to Appellant's good character. N.T., 12/6/12, 391-92, 398, 402-03. Appellant, who also testified at trial, admitted to approaching the Freeman residence searching for Victim, carrying a gun on his person, and shooting several shots towards Victim. *Id.* at 442-43, 445-46, 465.

On December 6, 2012, the jury convicted Appellant of first-degree murder, aggravated assault, recklessly endangering another person, firearms not to be carried without a license, and simple assault. On that same day, the trial court sentenced Appellant to life imprisonment for the first-degree murder conviction, four to eight years' incarceration for the aggravated assault conviction, one to two years' incarceration for the reckless endangerment conviction, and two to four years' incarceration for the firearms conviction. Simple assault merged for sentencing purposes. All sentences were to run concurrent to each other.

Appellant filed a post-sentence motion, which the trial court denied on June 14, 2013.  On June 21, 2013, Appellant filed a timely notice of appeal. On December 22, 2014, this Court affirmed Appellant's judgment of sentence. We held that the (1) evidence was sufficient to find Appellant guilty of first-degree murder and aggravated assault; (2) verdict was not against the weight of the evidence; and (3) trial court did not abuse its discretion in precluding evidence regarding Victim's prior bad acts or a neighbor's testimony that someone told Victim to stop reaching for his waist.  Appellant filed a petition for allowance of appeal, which the Pennsylvania Supreme Court denied on October 29, 2015.

On August 19, 2016, Appellant filed his first *pro se* PCRA petition.  On September 15, 2016, the PCRA court appointed counsel, who filed a counseled PCRA petition on November 14, 2016.  Appellant claimed that trial counsel was ineffective for failing to (1) impeach the credibility of two of the Commonwealth's witnesses; (2) request a jury instruction concerning credibility of witnesses; (3) request a jury instruction regarding "heat of passion"; (4) impeach the Commonwealth's witnesses using prior inconsistent statements; and (5) call character witnesses on Appellant's behalf.[3]  ***See*** PCRA

_____

[3] We note that after raising claims of ineffectiveness regarding jury instructions as to credibility of witnesses, "heat of passion," and impeaching witnesses with prior inconsistent statements, PCRA counsel also stated why these claims lacked merit and that trial counsel could not be deemed ineffective.  ***See*** PCRA Pet., 11/14/16, at 5, 6, 8 (unpaginated).

Pet., 11/14/16, at 4-11 (unpaginated). The PCRA petition also included a list of witnesses to be called at the evidentiary hearing, including Appellant, trial counsel, "Mrs. Kelly [Goss], Mr. [Ronald] Johnson, Mrs. [L.] Ford, and Mrs. [M.E.] Cruz."[4] *Id.* at Witness List for Evidentiary Hr'g.

On December 8, 2016, counsel filed an amended PCRA petition for the purpose of updating the witness list. *See* Am. PCRA Pet., 12/8/16. The updated witness list did not add new witnesses, but provided full names and addresses of some of the previously named witnesses. *Id.* at Am. Witness List for Evidentiary Hr'g.

On March 27, 2017, the PCRA court held a hearing, and on October 3, 2017, the PCRA court denied relief. Appellant filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) statement. The PCRA court filed a statement *in lieu* of a Pa.R.A.P. 1925(a) opinion.

Appellant raises the following issues on appeal:

1. Whether trial counsel was ineffective for failing to impeach the Commonwealth witness[es.]

2. Whether trial counsel was ineffective for failing to call character witnesses on the Appellant's behalf[.]

Appellant's Brief at 5 (full capitalization omitted).

Our standard of review from the dismissal of a PCRA petition is limited to examining "whether the record supports the PCRA court's determination

---

[4] This witness list did not include the witnesses' full names or addresses.

and whether the PCRA court's decision is free of legal error." ***Commonwealth v. Lawson***, 90 A.3d 1, 4 (Pa. Super. 2014) (citation omitted).

## Ineffectiveness of counsel

It is well-settled that to establish a claim of ineffective assistance of counsel, a defendant "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." ***Commonwealth v. Turetsky***, 925 A.2d 876, 880 (Pa. Super. 2007) (citation omitted). The burden is on the defendant to prove all three of the following prongs: "(1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." ***Id.*** (citation omitted); ***see Commonwealth v. Daniels***, 963 A.2d 409, 419 (Pa. 2009).

Our Supreme Court has explained:

A chosen strategy will not be found to have lacked a reasonable basis unless it is proven that an alternative not chosen offered a potential for success substantially greater than the course actually pursued. Prejudice in the context of ineffective assistance of counsel means demonstrating that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. Counsel is presumed to have been effective and the burden of rebutting that presumption rests with the petitioner.

*Commonwealth v. Fletcher*, 986 A.2d 759, 772 (Pa. 2009) (internal quotation marks and citations omitted).

We add that "boilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective." *Commonwealth v. Paddy*, 15 A.3d 431, 443 (Pa. 2011). Moreover, "[a] failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." *Daniels*, 963 A.2d at 419.

### A. Impeachment of the Commonwealth's witnesses

In Appellant's first issue, he argues that counsel was ineffective for failing to impeach Commonwealth witnesses Leonard Davis and Terrance Williams with evidence of their prior *crimen falsi* convictions. Appellant's Brief at 10-12. Our Supreme Court has stated that "[e]vidence of a witness's conviction for a crime involving dishonesty or a false statement is generally admissible." *Commonwealth v. Treiber*, 121 A.3d 435, 456 (Pa. 2015) (citing Pa.R.E. 609(a)). "A failure to so impeach a key witness is considered ineffectiveness in the absence of a reasonable strategic basis for not impeaching." *Id.* (citation omitted).

### 1. Leonard Davis

Appellant claims that Davis had a prior criminal trespass conviction from February of 2012. He contends that although the Commonwealth established during Davis' direct-examination that he "was in prison garb because of a parole violation," trial counsel "did not cross-examine or use [Davis']

conviction to discredit his testimony." Appellant's Brief at 10-11. Appellant maintains that there was no strategic bases for failing to impeach Davis and that the outcome of the case could have been different. *Id.* at 12.

By way of background, at the outset of Davis' testimony at trial, the following relevant exchange occurred:

> [Commonwealth:] And currently obviously you're in Dauphin County Prison. When did you go to Dauphin County Prison?
>
> [Davis:] Yesterday.
>
> Q And that was on a probation violation?
>
> A That's what they said.

N.T. Trial, 12/6/12, at 147. Davis then testified as to what occurred on the night of November 26, 2011.

> I mean, Eric, it happened so fast. When he, Tanisha, Masai and [Victim], we was all talking. The next thing you know [Appellant] comes over. We don't know where he came from. He had to be across the street, though, because of the angle.
>
> He was talking. I don't remember what he was saying, but I guess he was, like, you looking for us or whatever. We turned our head. Some other guys are coming, like, from the side of the porch and—
>
> * * *
>
> They started arguing. I'm like, what are we arguing for. There's kids in the crib. Why are you all doing this here? One guy is, no disrespect. I said, you already disrespecting for being here. So I don't know. They started arguing, I said, I'm going to be real. I said, it's all you all against us. We can go in the alleyway and settle our differences or whatever. I guess they didn't want to hear that. [Victim] went to pull up his pants, and I don't know why he kept doing it, and the guy told him to stop reaching. I told him to stop reaching. I'm, like, stop doing that. I seen the gun

- 8 -

drawn. That's when I grabbed Tanisha and I pushed her through the door. As I was pushing her, I heard shots.

*Id.* at 152-53. During cross-examination, defense counsel focused his questioning to Victim's "reaching":

[Defense counsel:] Did you see [Victim] begin to act like he was reaching for something?

[Davis:] I mean, he went to like pull up his pants. Then he tried to reach. I was just like, stop whatever you doing because you don't have anything, yeah.

Q And how many times do you recall the words stop reaching, stop reaching, being said by [Appellant]?

A Two times.

Q Okay. And after the first time, were you watching a little more closely what was going on with [Victim]?

A I mean, after -- yeah, when he said it again, that's when I was like, yeah.

* * *

Q The concern you had in terms of trying to get your friend to stop reaching was your concern you might get shot, correct?

A Yes, sir.

Q And even though he may not have had a gun, at the very least he acted, it might have been a bluff, correct?

A I mean, I'm not going to say that, but it could have been. I'm not going to lie. I don't know.

Q So once again, to be clear, [Victim] was tugging at his pants on the right-hand side?

A I remember just him pulling up his pants. That's all I remember. I don't remember which side.

*Id.* at 168-70.

The PCRA court concluded that trial counsel was not ineffective and stated:

Attorney Rosen testified as follows:

Mr. Davis, I thought, frankly, was our best witness. He was a Commonwealth witness, but I thought was our strongest witness. I would not have wanted to impeach him because he kind of corroborated the fact that [V]ictim in this case was intoxicated the night of the incident, and he in fact corroborated the fact that [Victim] had made at least two motions towards his waistband corroborating what [Appellant] testified to which caused him to become fearful for his safety and took the actions he took.

So we felt that the fact that – Mr. Davis, we tried to find him for quite a long period of time. We were unable to, but the Commonwealth found him and put him in protective custody before he testified.

[PCRA Hearing, 3-27-17, Notes of Testimony, pp. 8-9]. Attorney Rosen's testimony reflects that he had a reasonable trial strategy to not impeach Mr. Davis' honesty. Had Attorney Rosen requested a *crimen falsi* instruction, it would have further emphasized Mr. Davis' lack of honesty. Mr. Davis' trial testimony aided [Appellant]'s defense.

PCRA Ct. Op., 10/3/17, at 2. We agree with the PCRA court's rationale and conclude that trial counsel was not ineffective for failing to impeach Davis. *See Treiber*, 121 A.3d at 456; *Daniels*, 963 A.2d at 419.

## 2. Terrance Williams

Regarding Williams, Appellant argues that while the Commonwealth brought out on direct-examination that Williams was previously convicted, trial counsel did not use this conviction to discredit Williams' testimony. Appellant's Brief at 11. Appellant contends that trial counsel had no strategic

basis and that the outcome of the jury trial could have been different. *Id.* at 12. Appellant contends that since the jury was not given the opportunity to learn of this information, trial counsel was ineffective. *Id.*

During trial, the Commonwealth called Williams to testify, and the following exchange occurred:

[Commonwealth:] And currently you're incarcerated, correct?

[Williams:] Yes, I am.

Q In what facility?

A I just got transferred back to Dauphin County Prison.

Q What are you in prison for?

A Probation violation, absconding.

Q And that's out of Lycoming County?

A Yes, it is.

Q What was your original charge?

A Retail theft.

N.T., 12/6/12, at 174. Williams went on to testify that on the night of the shooting, he was heading to his friend's house when he heard around ten to twelve shots. *Id.* at 176. He stated that he did not see who was shooting but saw where the shots were coming from. *Id.* at 177. Williams testified that right after the shots were fired, he saw an individual leave in a car, and he gave a description of the individual and the car. *Id.* at 177-78. Williams then called the police. *Id.* at 178. On cross-examination, trial counsel did not refer to Williams' prior conviction for retail theft.

Instantly, Appellant makes a bald allegation of prejudice. Appellant, however, has not established any way in which he has been prejudiced by trial counsel's failure to impeach Williams by re-raising the evidence of Williams' prior conviction that was raised by the Commonwealth. Therefore, we agree with the PCRA court's conclusion that trial counsel was not ineffective for failing to impeach Williams.[5] *See Treiber*, 121 A.3d at 457; *Paddy*, 15 A.3d at 443.

## B.    Character witnesses

In his second issue, Appellant argues that trial counsel was ineffective for failing to call certain character witnesses on his behalf. Appellant's Brief at 12. Appellant claims that Rosa Pereira, Loayma Luz Tussen, and Maria Roman testified at the PCRA evidentiary hearing that they were willing to testify at trial but that trial counsel never contacted them. *Id.* at 12-13. Appellant further notes that an additional witness, Ronald Johnson, provided an affidavit that he would also have testified on Appellant's behalf. *Id.* at 13. According to Appellant, he had given trial counsel a list of people who "had reached out to [Appellant] and said [that they were] willing to come and testify on [his] behalf." *Id.* Appellant maintains that character witnesses would have

---

[5] Moreover, we note that the testimony offered by Williams was cumulative of other evidence presented at trial.

"directly supported" counsel's self-defense theory and the outcome of the case would have been different. *Id.* at 15.

At the evidentiary hearing, PCRA counsel called Pereira, Tussen, and Roman to testify, and moved into evidence an affidavit from Johnson.[6] Pereira testified that she has known Appellant for over ten years. N.T. PCRA Hr'g, 3/27/17, at 16. She explained that she lives approximately six houses from his grandmother's home, and she "see[s] him every day when he come[s] to see his grandma." *Id.* at 17. She stated that he "stop[s], talk[s] to everybody. He was quiet. I don't know. Happy. He was a good boy. He respect[s] everybody, you know, family, no problem." *Id.* at 19. She further testified that she was available and willing to testify on Appellant's behalf. *Id.* at 18. She acknowledged that she did not contact trial counsel about testifying at trial. *Id.* at 21.

Next, Tussen testified that Appellant was like an uncle to her. *Id.* at 24. She explained that Appellant played a big role in her upbringing and that he was the only father figure she had. *Id.* She stated that she was present during trial and had conversations with trial counsel about testifying. *Id.* at 25. She continued that she would have testified that Appellant was a

---

[6] Johnson was the only individual on Appellant's witness list whose statement was offered at the evidentiary hearing. The Commonwealth objected at the evidentiary hearing, noting that Appellant failed to identify Pereira, Tussen, and Roman, but the PCRA court overruled the objection. *See* N.T. PCRA Hr'g, 3/27/17, at 4. The Commonwealth also objected to Johnson's affidavit. *Id.* at 5, 42.

"nonviolent person[,] was very positive in the community with the children[, and was] very peaceful and loving." *Id.* at 27.

Roman testified that she knew Appellant since he was in middle school. *Id.* at 39. She stated that she was present during trial and was willing to testify. *Id.* She further stated that she "kn[e]w him as a person who works" and that she has been at birthday parties were he is present and he "always behave[s] very well." *Id.* at 40. She acknowledged that she did not contact trial counsel about testifying. *Id.* at 39.

PCRA counsel introduced an affidavit by Johnson. *Id.* at 42. The PCRA court admitted the affidavit over the Commonwealth's objection. *Id.* However, the affidavit was not included in the certified record.

Finally, Appellant testified at the PCRA evidentiary hearing. He stated that he gave several names to trial counsel of people who were willing to testify on his behalf. *Id.* at 33. He continued that the names he gave counsel were Ronald Johnson, Mary Cahill, Beverly Singleton, Kelly Goss, and Palmer.[7] *Id.* Appellant also testified that during trial he asked trial counsel if he was going to call any character witnesses and that trial counsel replied that he was. *Id.* at 34. However, Appellant continued, the witnesses that trial counsel called were not the witnesses that Appellant had identified. *Id.*

Generally, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in

_____

[7] Appellant does not indicate Palmer's first name.

accordance with the character or character trait." Pa.R.E. 404(a)(1). However, "a defendant may offer evidence of a pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it[.]" Pa.R.E. 404(a)(2)(A).

We have explained that

evidence of good character is to be regarded as evidence of substantive fact just as any other evidence tending to establish innocence and may be considered by the jury in connection with all of the evidence presented in the case on the general issue of guilt or innocence. Evidence of good character is substantive and positive evidence, not a mere make weight to be considered in a doubtful case, and, . . . is an independent factor which may of itself engender reasonable doubt or produce a conclusion of innocence. Evidence of good character offered by a defendant in a criminal prosecution must be limited to his general reputation for the particular trait or traits of character involved in the commission of the crime charged. The cross-examination of such witnesses by the Commonwealth must be limited to the same traits. Such evidence must relate to a period at or about the time the offense was committed, and must be established by testimony of witnesses as to the community opinion of the individual in question, not through specific acts or mere rumor.

*Commonwealth v. Goodmond*, --- A.3d ---, 2018 WL 2996061, at *3 (Pa. Super. 2018) (citation and emphases omitted).

Moreover, "failure to call character witnesses [at trial] does not constitute *per se* ineffectiveness." *Treiber*, 121 A.3d at 463 (citation omitted). An appellant must show that

(1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the

- 15 -

witness was so prejudicial as to have denied the defendant a fair trial.

*Id.* at 464 (citation omitted).

Here, Appellant testified at the PCRA hearing that he provided trial counsel with names of witnesses who were willing to testify at trial. Notably, Pereira, Tussen, and Roman were not among the witnesses Appellant named before trial. N.T., 3/27/17, at 33. Moreover, Pereira and Roman testified that they did not contact trial counsel to inform him that they were willing to testify on Appellant's behalf. *Id.* at 21, 39. Therefore, Appellant has failed to prove that trial counsel knew, or should have known, of their existence. *See Treiber*, 121 A.3d at 464.

As for Tussen, the absence of her testimony was not so prejudicial as to have denied Appellant a fair trial. The evidence at trial was overwhelming. Two nights before the shooting Appellant twice struck Victim at a pub after Victim hugged and grabbed Appellant's girlfriend's buttocks. *Olivo-Noble*, 1112 MDA 2013, at 2. The Commonwealth presented video footage at trial of both instances of Appellant hitting Victim. *Id.* Two nights later, Appellant unsuccessfully searched for Victim at the Freeman residence. *Id.* Later that night, Appellant again approached the Freeman residence in search of Victim while Appellant was armed. *Id.* at 3. Several witnesses testified as to Appellant's deliberate act of shooting Victim. *Id.* Several witnesses also testified that Appellant fired two sets of shots, totaling from ten to twelve shots. N.T., 12/6/12, at 155, 172, 176, 194. Appellant, who testified at trial,

admitted to carrying a weapon and shooting in Victim's direction. *Id.* at 465. Therefore, we agree with the PCRA court's conclusion that Tussen's testimony that Appellant was a nonviolent, peaceful, and loving person, and that he was a positive figure in the community would not have changed the outcome of the trial. *See Treiber*, 121 A.3d at 464.

Lastly, we address the issue of Johnson's affidavit. This Court has stated that it is an appellant's responsibility "to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." *See Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa. Super. 2006) (*en banc*) (citation omitted). The reason for this is that the certified record is "[t]he fundamental tool for appellate review." *Id.* at 6 (citation omitted). It is an "official record of the events that occurred in the trial court." *Id.* (citation omitted). "Simply put, if a document is not in the certified record, the Superior Court may not consider it." *Id.* (citation omitted).

We have conducted a thorough review of the certified record and have not found Johnson's affidavit. Therefore, because the affidavit is not contained in the certified record, we are not equipped to review this claim. *See Preston*, 904 A.2d at 6.

Accordingly, Appellant's claim that trial counsel was ineffective for failing to call Pereira, Tussen, Roman, and Johnson to testify at trial as character witnesses lacks arguable merit. *See Daniels*, 963 A.2d at 419.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/5/2018