J-S38038-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                               :          PENNSYLVANIA
                               :
            v.                   :
                               :
                               :
SHANE DOUGLAS PITTMAN      :
                               :
          Appellant       :  No. 46 MDA 2020

Appeal from the PCRA Order Entered December 5, 2019
In the Court of Common Pleas of Fulton County Criminal Division at
No(s):  CP-29-CR-0000271-2009

BEFORE:  KUNSELMAN, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:       **FILED SEPTEMBER 22, 2020**

Appellant Shane Douglas Pittman appeals from the order of the Court of Common Pleas of Fulton County dismissing his petition pursuant to the Post-Conviction Relief Act ("PCRA").[1]  Appellant raises several claims that trial counsel provided ineffective representation.  We affirm.

We previously summarized the factual background and procedural history of this case on direct appeal as follows:

> On February 1, 2010, Appellant was charged by criminal information with criminal homicide and endangering the welfare of children. Appellant initially pled guilty to the offense of third degree murder on May 12, 2011. However, he subsequently withdrew his plea on July 1, 2011. On September 21, 2011, the trial court *nolle prossed* the endangering the welfare of children charge at the Commonwealth's request. Appellant's jury trial commenced on September 28, 2011, and on September 29, 2011,

---

[*] Former Justice specially assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.

the jury convicted Appellant of third degree murder. The following facts were presented at Appellant's trial:

> [T]wo-year-old Kylie York ("Kylie") died on December 5, 2009, from blunt force trauma to the head and neck.
>
> On December 2, 2009, Shannon Wood ("Wood"), Kylie's mother and [Appellant]'s girlfriend, returned home from work at 1:00 p.m. to find her daughter "asleep" on the couch. [Appellant], who had been watching Kylie while her mother worked, informed Wood that Kylie had vomited. Since Kylie [complained of] a stomachache the day before, Wood called and made an appointment with Kylie's pediatrician. When Wood attempted to wake Kylie to take her to her doctor's appointment, she was unable to do so. [Appellant] and Wood rushed Kylie to the Fulton County Medical Center. In the evening of December 2, 2009, Kylie was transferred to Hershey Medical Center [(HMC)]. Despite the efforts of a team of pediatricians in the Pediatric Care Unit at Hershey Medical Center, Kylie died on December 5, 2009.

Trial Court Opinion (TCO), 6/17/2014, at 1–2 (internal citations omitted).

Kylie had spent Thanksgiving with her father, who returned the girl to Wood on Sunday, November 29, 2009. Although Wood noticed that Kylie had a bruise on her head, she indicated that, over the next few days, Kylie did not seem abnormal in any way. Wood testified that apart from the stomach ache the night before, Kylie was also in a normal condition while Wood was getting ready to leave for work at 7:45 a.m. on December 2, 2009. At that time, Wood gave Kylie something to eat, turned on a movie, and left her on the bed where Appellant was still sleeping. Wood's shift started at 8:00 a.m.

Appellant's testimony confirmed that he was home alone with Kylie on the morning of December 2, 2009, until Wood returned at 1:00 p.m. He awoke at about 8:00 a.m., when Wood was leaving for work, but he and Kylie both dozed off soon thereafter. When he re-awoke, Kylie was still at the foot of the bed, watching a blank screen. He took her to the kitchen where he fed her some sherbet, but she only took a few bites. He then tried to color with Kylie in the living room, an activity they enjoyed doing together before. After coloring for a while, Kylie threw up. [The trial court found that Appellant:]

carried her to the bathroom to clean her up. Kylie then helped dress herself and walked to the couch where she lay down and asked for her mom and a cup of juice. Kylie then fell asleep and never woke up. On the stand, [A]ppellant denied that he told police [that] Kylie's head had snapped back and forth approximately ten times as he ran with her from the living room to the bathroom or that he had dropped Kylie into the tub. [Appellant] admitted that he used the words "snapped" and "dropped" in two written statements but only because they were suggested by the [interviewing policemen].

TCO, at 5 (internal citations omitted).

The Commonwealth presented several expert witnesses who "painted a very different picture of the events of December 2, 2009." *Id.* These experts testified that "the injuries sustained by Kylie could not have been caused by simply running with her from the living room to the bathroom as [Appellant] alleged to police and later to the jury." *Id.* at 6.

Dr. Samuel Land, a forensic pathologist, performed the autopsy on Kylie. He testified that Kylie died "as a result of blunt force trauma to the head and neck." N.T., [Trial,] 9/28/11, at 50. He indicated that there was a whiplash-type injury to the ligaments holding Kylie's head to the top of her neck, "three separate impact sites to her head[,]" as well as "some type of rotational damage" to the brain. *Id.* at 51, 55. This type of damage would have caused a "rapid decrease in [Kylie's] ability to perform normal activities" in "seconds to minutes." *Id.* at 57.

Dr. Land specifically rejected the idea that Kylie could have sustained such severe injuries and remained lucid for several days afterward. *Id.* at 57–58. He also rebuffed the notion that her injuries could have occurred as a result of "quickly picking Kylie up, quickly running with her down the hallway, and dropping her in a[n empty bathtub][.]" *Id.* at 59. Additionally, Dr. Land rejected that Kylie's injuries could have been caused or facilitated by several of the theories offered by Appellant's expert witness, described *infra.* Dr. Land indicated that he had only observed injuries as severe as those sustained by Kylie in car accidents and high falls, although he noted that he was "aware of other instances" where children had sustained similar injuries, such as when "a child has been accidentally struck in the head with a tree

branch or a baseball bat or [by] bricks ... fallen from buildings, things like that." *Id.*

Dr. Daniel Brown, a neuropathologist, examined Kylie's brain and spinal cord after her death. He testified that Kylie suffered from numerous hemorrhages of the brain and spinal cord, all of which were "fresh, or less than three-day[s]-old." *Id.* at 76. He also detected a brain bruise on the left temporal region of Kylie's brain. He indicated that in the pediatric population, such bruises only result after the application of a significant amount of force. He also indicated that there was a "rotation or shaking motion of the brain ... [t]hat would not have spontaneously happened." *Id.* at 81.

Dr. Robert Tamburro, Jr., a pediatric critical care physician, cared for Kylie during her hospitalization at HMC. When he began treating Kylie, her pupils were not reacting to stimuli, a "very worrisome sign of severe injury." *Id.* at 121. The pressure created by bleeding in the subdural space of Kylie's brain was "astronomically high." *Id.* at 126. Dr. Tamburro indicated that although the most common and likely source of Kylie's injuries was physical trauma, he and the staff at HMC tested Kylie for other potential causes. The results of those tests showed that there were no "inborn errors of metabolism[,]" severe dehydration, or clotting issues (coagulopathy) which could have caused the subdural bleeding in Kylie's brain. *Id.* at 127–29. Dr. Tamburro also indicated that tests did not show any evidence of an infection. Ultimately, Dr. Tamburro concluded that Kylie's condition and subsequent death had been caused by injury rather than an illness, although he declined to opine regarding whether her injuries were accidental.

Dr. Kathryn Cromwell, a member of the child safety team at HMC, examined Kylie's medical records and test results and concluded that Kylie had suffered compression fractures of her thoracic vertebrae. Dr. Cromwell indicated that compression fractures of that nature were unlikely in children even if they fell from "a significant height and land[ed] directly on their butt[.]" *Id.* at 161. She said it would be "very rare" for such injuries to occur "from falling from a standing height, or falling while running, or failing off a sofa, something [of] that nature." *Id.*

Consequently, Dr. Cromwell concluded that Kylie suffered from an "inflicted brain injury." *Id.* at 162. She specifically rejected that anything that occurred during Appellant's version of events could have caused Kylie's injuries:

Q. Could the injuries that resulted in her death ... been caused by [Appellant's] picking Kylie up quickly, if she were on the floor, say lying on the floor, sitting on the floor, picking her up very quickly, could that have cause these injuries?

A. No, it could not.

Q. What about [Appellant's] carrying her down a hallway, running with her, holding her in his hands out in front?

A. No, that could not have cause[d] her injuries.

Q. Could these injuries that you described, inflicted injuries, have been caused by [Appellant's] dropping Kylie into a dry bathtub from about two feet?

A. Th[at] wouldn't have caused all of her injuries. It's possible it might have contributed to her fractures but not to her brain injury.

Q. Could these injuries have been caused by [Appellant's] restraining Kylie in a bathtub while he was trying to bathe her and she was trying to get out?

A. I do not believe so.

Q. Could Kylie have self-inflicted the kind of injuries that you saw, say, I don't know, by jumping on like a trampoline, or on a bed flying off and hitting the night stand, or something like that?

A. No, she could not.

*Id*. at 162–63.

On November 21, 2011, the trial court sentenced Appellant to a term of 20–40 years' incarceration. Appellant filed a timely post-sentence motion on November 29, 2011, alleging that the Commonwealth had failed to disclose evidence of a phone call that Appellant had made while imprisoned prior to trial. On December 15, 2012, Appellant filed a notice of appeal with this Court, even though the trial court had yet to rule on his post-sentence motion. Appellant then field a Praecipe to Discontinue Appeal on January 13, 2012. In an order and opinion dated February 15, 2012, the trial court denied Appellant's post-sentence motion. No appeal was taken from that order.

> On January 28, 2013, Appellant filed a timely petition for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541 *et seq.,* seeking reinstatement of his direct appeal and post-sentence motion rights *nunc pro tunc.* By opinion and order dated April 29, 2014, the PCRA court reinstated Appellant's direct appeal rights but denied his request to reinstate his post-sentence motion rights. On May 9, 2014, Appellant filed a *nunc pro tunc* notice of appeal from his judgment of sentence.

**Commonwealth v. Pittman**, 835 MDA 2014, 2014 WL 10788702, at *1–4 (Pa.Super. Nov. 18, 2014) (unpublished memorandum). On November 18, 2014, this Court affirmed the judgment of sentence and on March 24, 2015, our Supreme Court denied Appellant's petition for allowance of appeal.

On October 18, 2015, Appellant filed a *pro se* PCRA petition and the PCRA court appointed Edward Qaqish, Esquire, to represent Appellant. After Attorney Qaqish filed a motion to withdraw, the PCRA court appointed Michael O. Palermo to serve as Appellant's counsel on January 7, 2016.

Over three years later, on January 30, 2019, Attorney Palermo filed an amended PCRA petition on Appellant's behalf, raising several claims of the ineffectiveness of trial counsel.[2] Specifically, Appellant claimed trial counsel should have retained additional expert testimony to testify for the defense, called his sister and brother-in-law to testify on his behalf, and filed a motion to suppress his statement to the police. On April 16, 2019, the PCRA court held a hearing at which Appellant participated by video conference.

---

[2] The record does not contain an explanation for Attorney Palermo's three year delay in filing the amended PCRA petition.

On December 4, 2019, the PCRA court filed an order and opinion dismissing Appellant's petition. Appellant filed a timely appeal and complied with the PCRA court's direction to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises the following issues for our review on appeal:

1. By failing to retain/call supporting experts to set forth a defense at trial, merely presenting one expert witness who was 82 years of age and who's testimony at times appeared confused – at one point he couldn't remember the school he attended, Attorney Harvey was ineffective at trial of this matter.

2. By failing to call defense witnesses Amanda Oliver and Michael Oliver when their testimony was available at trial of this matter, Attorney [Harvey] was ineffective.

3. By failing to file a pre-trial Motion to Suppress statements made by the Appellant while at hospital under duress, Attorney Harvey was ineffective at trial of this matter.

Appellant's Brief, at 6 (verbatim).

Our standard of review is well-established:

[o]ur review of the grant or denial of PCRA relief is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. **Commonwealth v. Cox**, 636 Pa. 603, 146 A.3d 221, 226 n.9 (2016). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions. **Commonwealth v. Burton**, 638 Pa. 687, 158 A.3d 618, 627 n.13 (2017).

**Commonwealth v. Small**, 647 Pa. 423, 440–41, 189 A.3d 961, 971 (2018).

As stated above, Appellant raises several claims of trial counsel's ineffectiveness. Our review is guided by the following principles:

> [a]s originally established by the United States Supreme Court in **Strickland v. Washington**, 466 U.S. 668, [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), and adopted by Pennsylvania appellate courts, counsel is presumed to have provided effective representation unless a PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome at trial if not for counsel's error.

> **Commonwealth v. Wantz**, 84 A.3d 324, 331 (Pa.Super. 2014) (citations omitted). "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." **Commonwealth v. Daniels**, 600 Pa. 1, 963 A.2d 409, 419 (2009).

**Commonwealth v. Selenski**, 228 A.3d 8, 15 (Pa. Super. 2020).

First, Appellant claims his trial counsel was ineffective in failing to retain and call supporting defense experts when the only expert called to testify on Appellant's behalf exhibited a memory lapse on the witness stand and appeared to be confused during parts of his testimony.

Our review of this claim is guided by the following principles:

> [t]o satisfy the prejudice prong of this test when raising a claim of ineffectiveness for the failure to call a potential witness at trial, our Supreme Court has instructed that the PCRA petitioner must establish that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew, or should have known, of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. **Commonwealth v. Sneed**, 616 Pa. 1, 22–23, 45 A.3d 1096, 1108–109 (2012) (citing **Commonwealth v. Johnson**, 600 Pa. 329, 351, 966 A.2d 523, 536 (2009) and **Commonwealth v. Clark**, 599 Pa. 204, 222, 961 A.2d 80, 90 (2008)).

**Commonwealth v. Wantz**, 84 A.3d 324, 331 (Pa.Super. 2014).

To resolve this claim, it is helpful to review trial counsel's testimony with respect to his strategy in forming Appellant's defense. At the PCRA evidentiary hearing, trial counsel explained that he first petitioned the court for funds to retain Dr. Harold Buttram to review Kylie's medical reports in order to assist him to formulate a medical defense. Trial counsel was referred to Dr. Buttram by York County public defenders, who had hired Dr. Buttram to testify in a similar case and indicated they were "very satisfied with his work." N.T., PCRA hearing, 4/16/19, at 54.

After reviewing Kylie's medical records, Dr. Buttram pointed out a discrepancy in the radiology reports provided by Fulton County Medical Center and Hershey Medical Center. *Id*. at 51. While Fulton County Medical Center's radiologist reported that Kylie's injuries were subacute (in that she could have been injured days before her death), the Hershey Medical Center radiology report indicated that Kylie's injuries were acute (caused hours before her death). *Id*.

Based on this information, trial counsel developed a theory of the case that Kylie's injuries were caused by her father while she was in his custody over the Thanksgiving holiday. *Id*. at 51-52. Trial counsel believed that this theory was corroborated by Kylie's mother, Wood, who indicated that she noticed a bruise on Kylie's head when she returned from her father's home days before her death. *Id*.

While trial counsel did not initially intend to offer Dr. Buttram to testify at Appellant's trial, he felt it was Appellant's only option when trial counsel

could not find other experts to testify in Appellant's defense. *Id*. at 62-63, 67-68. Trial counsel indicated that he found eighty-two year old Dr. Buttram to be "very articulate," "charming," and "lucid," and did not have any indication that Dr. Buttram would not be a competent witness, noting that Dr. Buttram had written a book and had served as an expert in a New York case on the previous day. *Id*. at 63-64. Trial counsel denied having any indication that Dr. Buttram had any memory difficulties. *Id*. at 63-64.

When Dr. Buttram testified in Appellant's case, trial counsel admitted that Dr. Buttram "froze like a deer in headlights." *Id*. at 63-66. A review of the trial transcript shows that Dr. Buttram exhibited a memory lapse when he was asked about his graduation from medical school education in 1958 and his subsequent residency. N.T., 9/29/11, at 55-56. Dr. Buttram asked for a moment to compose himself and indicated that he was tired and a little nervous. *Id*.

To the extent that Appellant claims that counsel had no reasonable basis to call Dr. Buttram as an expert witness, we note the following:

> In considering whether counsel acted reasonably, we look to whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

*Commonwealth v. Barnett*, 121 A.3d 534, 540 (Pa.Super. 2015). We also are cognizant that:

- 10 -

although a perfectly conducted trial is indeed the ideal objective of our judicial process, the defendant is not necessarily entitled to relief simply because of some imperfections in the trial, so long as he has been accorded a fair trial. A defendant is entitled to a fair trial but not a perfect one.

*Commonwealth v. Wright*, 599 Pa. 270, 298, 961 A.2d 119, 135 (2008).

In this case, we find that trial counsel acted reasonably in seeking to secure expert testimony to assist the defense and in retaining Dr. Buttram, who was recommended by fellow defense attorneys. As noted above, Dr. Buttram was helpful to the defense as he identified an inconsistency in Kylie's medical records and directed trial counsel to seek the advice of more specialized medical experts. Additionally, while Appellant faults trial counsel for Dr. Buttram's brief memory lapse, we cannot find that trial counsel should have foreseen that Dr. Buttram would have had any difficulty testifying and decline to find counsel ineffective premised upon hindsight evaluation.

In addition, while Appellant claims trial counsel should have called additional expert witnesses to testify in support of his theory of the case, he fails to identify a particular expert witness that would be willing to testify for the defense. To the contrary, trial counsel testified at the PCRA hearing that he sought to retain the assistance of a radiology expert and a kinetic expert, but admitted that neither expert would have offered testimony that would advance Appellant's cause. *Id*. at 55. The radiology expert opined that Kylie's injury was "fresh" and occurred within hours of her death and thus, could not have been caused by the child's father on the prior weekend. *Id*. at 56-59. The kinetic expert's opinion corroborated prosecution expert Dr. Land's

testimony that Kylie's injury was caused by blunt force trauma. *Id*. at 59-61. As a result, we find this ineffectiveness claim fails.

Second, Appellant argues that trial counsel was ineffective in failing to call his sister, Amanda Oliver, and his brother-in-law, Michael Oliver, to testify that they had witnessed Wood (Kylie's mother) physically abusing the child on one occasion in November 2009. At the PCRA hearing, the Olivers testified that Wood had become angry when Kylie hit Wood in the face with a hairbrush and knocked her glasses off. N.T. PCRA hearing, 4/16/19, at 7-8, 20. The Olivers both claimed that they observed Wood violently shaking the child and then throwing her. *Id*. The Olivers felt they should have been permitted to testify that they had seen Wood abusing Kylie and could assert that Appellant would never abuse a child.

Trial counsel admitted that he had met with the Olivers before trial and was aware they were willing and available to testify to their observations of Wood. However, trial counsel had concerns with calling the Olivers to testify. Trial counsel reiterated that he intended to present a theory that Kylie's father had caused the child's injuries over Thanksgiving break. As Wood would offer key testimony that Kylie had a bruise on her head when she returned home after the holiday, trial counsel did not want to attack Wood, who was a favorable defense witness. *Id*. at 51-52.

Further, trial counsel doubted the weight the jury would give such testimony from Appellant's sister and brother-in-law who were seeking to prove him innocent and would presumably have been seen by the jury as

- 12 -

biased. *Id*. at 53. Moreover, trial counsel was concerned that the Olivers would testify as to their opinion of Appellant's character and inadvertently open the door to the admission of unfavorable character evidence, such as Appellant's prior conviction in Maryland related to arson. *Id*.

Moreover, Appellant has failed to show that trial counsel's decision not to call the Olivers to testify caused Appellant prejudice such that there was a reasonable probability of a different outcome at trial if not for counsel's error. The prosecution presented numerous experts that testified that Kylie's injuries were caused by blunt force trauma within hours or minutes of her death and would have led to Kylie experiencing convulsions, stupor, and unconscious within minutes of her injuries. Dr. Land indicated Kylie's brain damage was so severe that once she was sustained injuries, he would expect that "there would be a rapid decrease in her ability to perform normal activities, talking seconds to minutes [sic]." N.T., 9/28/11, at 57. Dr. Land explained this further in the following exchange with the prosecutor:

> [Prosecutor:] Would [Kylie] have, after sustaining the injuries that you saw on the autopsy, have been able to walk or talk?
>
> [Dr. Land:] I don't believe so.
>
> [Prosecutor:] Would she have been able to dress herself?
>
> [Dr. Land:] No.
>
> [Prosecutor:] Would she have been able to make requests for things or ask questions?
>
> [Dr. Land:] I don't believe so.

[Prosecutor:] And what would those signs or symptoms have been?

[Dr. Land:] Often times the children develop agonal respirations, inappropriate breathing patterns. They're unable to breathe properly. They're unable to handle their secretions, because [their] swallowing mechanisms may be interfered with. They can develop seizure activity, posturing, twisting of the limbs, their eyes can roll up into their head. *They do not look normal at that point*.

*Id*. (emphasis added).

Regardless of this expert testimony, Appellant took the stand and admitted that he cared for Kylie in the hours before her death and did not indicate that Kylie exhibited any abnormal symptoms other than indicating that she felt sick and had vomited. Appellant left Kylie on the couch for her mother to discover her unresponsive when she returned home from work. Appellant did not seek the assistance of emergency personnel or take her to the hospital. As such, we conclude that this ineffectiveness claim also fails.

Lastly, Appellant argues that trial counsel was ineffective in failing to seek to suppress his statement to the police on the basis that he was coerced into speaking about the victim's death.

At the PCRA hearing, trial counsel asserted that when he first met with Appellant on December 17, 2009 and took extensive notes of their conversation. Appellant gave trial counsel no indication that his statement to police was coerced, but actually asserted that he voluntarily chose to give a statement as he had "nothing to hide." N.T., 4/16/19, at 45-47. Appellant indicated to trial counsel that the officers had told him that he was not required

to talk to them and was free to leave at any time. *Id*. at 46. In addition, trial counsel indicated that Appellant had asserted that the officers were persistent in questioning him, but denied that they had threatened him or pressured him in any way. *Id*. at 46-47. Counsel also ensured that Appellant had been given his *Miranda* rights before he gave his statement. *Id*. at 47.

Thereafter, trial counsel asserted that Appellant sent him a letter in September 2010, claiming that the police had threatened him, screamed in his face, and told him what to write in his statement. *Id*. at 95-96. However, trial counsel recalled that the parties had already filed and litigated their pre-trial motions at that point. *Id*. Further, trial counsel felt that Appellant's claim of police coercion was completely inconsistent with his prior claim that he gave the statement to police as he had nothing to hide. The PCRA court specifically found that trial counsel testified credibly on this point. As such, we agree with the PCRA court's assessment that trial counsel had a reasonable basis not to pursue the suppression of Appellant's statement and thus, was not ineffective on this basis.

Based on the foregoing reasons, we conclude that the PCRA court did not err in dismissing Appellant's PCRA petition.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/22/2020