J-S52045-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| KELVIN MONTERO | : | |
| | : | |
| Appellant | : | No. 2383 EDA 2019 |

Appeal from the PCRA Order Entered August 9, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0000977-2012

BEFORE:   PANELLA, P.J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:            **FILED:  JANUARY 11, 2021**

Appellant Kelvin Montero appeals the order of the Court of Common Pleas of Philadelphia County denying his petition pursuant to the Post-Conviction Relief Act (PCRA).[1]  Appellant claims he is entitled to a new trial due to the ineffectiveness of his trial counsel.  After careful review, we affirm.

Appellant was charged with first-degree murder, conspiracy to commit murder, and related crimes in connection with the September 26, 2011 shooting death of Jesus Rivera.  The trial court previously summarized the relevant facts as follows:

> In the early morning hours of September 26, 2011, 16–year–old Jesus Rivera [(the victim)] was still out celebrating the Puerto Rican Day Parade in his Philadelphia neighborhood when he was struck and killed by two stray gunshots fired by Kelvin Montero [(Appellant)]. After the parade, which had taken place on

---

[*] Former Justice specially assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.

September 25, 2011, people were celebrating all along the area of 5th and Cambria Streets, congregating on street corners, playing music, and hanging out in and around their vehicles. This was the unofficial parade "after party."

It was at the Puerto Rican Day Parade after party that the [Appellant] fought with his girlfriend in front of a street of witnesses, and punched Saul Rodriguez (Rodriguez) in the face. [Footnote 5] At approximately 8:30 P.M., Rodriguez was standing near a black Lincoln Town Car full of girls, when [Appellant] walked up to the car, pulled his girlfriend, Cynthia Vasquez (Vasquez), out of it, and dragged her down the street. Angel Ducvo (Ducvo) [Footnote 6] and Rodriguez saw [Appellant] strike Vasquez. After bystanders tried to intervene, a fight ensued but was broken up by the police. Later, [Appellant] punched Rodriguez in the face when Rodriguez was trying to talk to the girls from the Lincoln Town Car again. After Rodriguez was punched, John Perez, [Footnote 7] who was described as a bald-headed, tattooed man, got out of a burgundy red pickup truck and approached Rodriguez, yelling: "you all don't know who you're messing with. That's my boy. We'll be back. You don't know who you're fucking with."

[Footnote 5] Rodriguez provided a statement about this encounter to Detective Joseph Bamberski. Exhibit C–19. When Rodriguez was called to testify, he recanted his prior statement. Rodriguez admitted that the signature on the statement appeared to be his, but stated that he did not remember signing it. Rodriguez's account of the events of September 25, 2011 was admitted for its truth pursuant to **Brady/Lively**. **Commonwealth v. Brady**, 71 A.2d 34, 36 (Pa.Super.1987); **Commonwealth v. Lively**, 703 A.2d 467 (Pa.Super.1997).

[Footnote 6] Angel Ducvo's nickname is "Abo." At trial, Ducvo denied telling the truth in the statement he made when he was brought into the Homicide Unit on September 28, 2011. Exhibit C–20. Ducvo's prior statement was also admitted for its truth pursuant to **Brady/Lively**.

[Footnote 7] Perez was initially charged as a co-defendant. On July 15, 2013, Perez entered a negotiated guilty plea to murder of the third degree (F–1), criminal conspiracy (F–1), and persons not to possess firearms (F–2). 18 Pa.C.S. §§ 2502(c), 903, and 6105(a)(1), respectively. Per the negotiations, this Court sentenced Perez to an aggregate

term of not less than 22–and–a–half years nor more than 45 years['] imprisonment.

Later that night, after 12 A.M., Angel Figueroa (Figueroa), who had also witnessed the earlier fight, saw [Appellant] and Perez again at 5th and Cambria Streets. [Appellant] was wearing black boots and a black hooded sweatshirt, and asked Figueroa for the man who was fighting earlier. Figueroa testified that [Appellant] had his hands under his sweatshirt, as if to indicate that he had a gun on him. A short time later, [Appellant] [Footnote 8] opened fire, firing 30 shots in all directions. [Footnote 9]

[Footnote 8] Keyshla Rivera, Jesus's sister, identified the [Appellant] as the shooter. Ducvo also identified [Appellant] as the shooter pursuant to a photo array compiled by the police. During the shooting, Ducvo did not actually see the shooter's face, but he was able to recognize [Appellant] as the shooter based on their earlier encounter on Westmoreland Street 20 minutes before the shooting began.

[Footnote 9] At the crime scene, 30 fired cartridge casings (FCCs) were found. At 12:40 A.M. Officer Brian Waters responded to a call at 5th and Cambria Streets to look for a burgundy Ford F–150 pickup truck. Officer Waters stopped the truck, which was being driven by Perez. The Ford pick-up was taken in to the police station as evidence. A later search of the truck revealed a Glock 9mm handgun in a hidden compartment on the right side of the front dashboard. Additionally, two handgun magazines were found: one empty 30–round magazine and another full 15–round magazine. Officer Lawrence Flagler, a ballistics expert, determined that all 30 FCC's were fired from the 9mm handgun found in that truck.

After midnight on September 26, 2011, Jesus and his sister Keyshla Rivera (Keyshla) were standing on the corner of 5th and Cambria Streets, waiting for Keyshla's friend to pick them up, when they heard people shouting, "they're shooting!" Upon hearing the gunshots, Keyshla glanced in the direction of the commotion, and witnessed [Appellant] in all black, "shooting like crazy" down the street. Keyshla and Jesus ran in the opposite direction of the shooter down Fairhill Street, attempting to seek safety inside two homes. After being turned away from the two homes on Fairhill Street, Keyshla told her brother to duck down

behind two cars for cover. Finally, after the shooting ceased, Keyshla noticed her brother, Jesus, on the ground screaming for help. Jesus was struck by two bullets, one to the right side of his chest that went through his heart and lungs, and a second to the right upper arm. [Footnote 10]

> [Footnote 10] Associate Medical Examiner, Dr. Aaron Rosen, testified that one of the bullets penetrated the right side of Jesus's body below his armpit. This bullet passed through the thoracic cavity and Jesus's right lung, causing internal bleeding. Dr. Rosen stated that the other bullet was retrieved in the upper right arm and fractured Jesus's humerus.

> The search for [Appellant] commenced on September 28, 2011, after an arrest warrant had been issued. On November 1, 2011, Detective Burke found [Appellant] on the second floor of a home in the Hunting Park neighborhood of Philadelphia, and he was arrested.

Trial Court Opinion (T.C.O.), 10/29/14, at 2–4 (citations omitted).

Thereafter, a jury convicted Appellant of conspiracy to commit first-degree murder but could not reach a verdict on the charges of first-degree murder, carrying a firearm without a license, and possessing an instrument of crime (PIC). On September 10, 2013, the trial court sentenced Appellant to eighteen to forty years' imprisonment for conspiracy.

After a retrial, on December 20, 2013, the jury convicted Appellant of the remaining charges. On that date, the trial court sentenced Appellant to life imprisonment for the murder conviction, two to seven years' imprisonment for carrying a firearm without a license, and one to five years' imprisonment for PIC. Appellant filed post-sentence motions, which the trial court denied. On July 8, 2015, this Court affirmed the judgments of sentence. Appellant did not file a Petition for Allowance of Appeal with the Supreme Court.

On August 5, 2016, Appellant filed a timely *pro se* PCRA petition. The PCRA court appointed counsel, who filed an amended petition on March 8, 2018. Appellant claimed trial counsel was ineffective in failing to impeach eyewitness Keyshla Rivera with Facebook messages that she allegedly sent to Appellant's friend, Steven Ortiz, in which she contradicted her testimony identifying Appellant as the shooter.

The PCRA court held hearings on March 8, 2019, April 15, 2019, and June 14, 2019, at which Appellant presented the testimony of trial counsel, Dennis Turner, Esq., and Steven Ortiz. The Commonwealth called Keyshla Rivera to testify, but the PCRA court struck her testimony as it found the prosecution violated its order concerning contact with Rivera. On July 10, 2019, the Commonwealth filed an interlocutory appeal regarding the PCRA court's decision to strike Keyshla Rivera's testimony. On July 30, 2019, the Commonwealth withdrew its appeal and on August 9, 2019, the PCRA court dismissed Appellant's petition. This timely appeal followed.[2]

Appellant's sole claim on appeal is whether his trial counsel was ineffective in failing to properly impeach one of the prosecution's witnesses. Our standard of review is well-established:

> [o]ur review of the grant or denial of PCRA relief is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. **Commonwealth v. Cox**, 636 Pa. 603, 146 A.3d 221,

---

[2] As the PCRA judge, the Honorable Teresa Sarmina, retired from the bench in August 2019, she did not write an opinion regarding her decision to dismiss Appellant's petition.

226 n.9 (2016). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions. *Commonwealth v. Burton*, 638 Pa. 687, 158 A.3d 618, 627 n.13 (2017).

*Commonwealth v. Small*, 647 Pa. 423, 440–41, 189 A.3d 961, 971 (2018).

We review claims of ineffectiveness in light of the following principles:

> [a]s originally established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), and adopted by Pennsylvania appellate courts, counsel is presumed to have provided effective representation unless a PCRA petitioner pleads and proves all of the following: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome at trial if not for counsel's error.

*Commonwealth v. Wantz*, 84 A.3d 324, 331 (Pa.Super. 2014) (citations omitted). "A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." *Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 419 (2009).

*Commonwealth v. Selenski*, 228 A.3d 8, 15 (Pa.Super. 2020).

Appellant claims his trial counsel was ineffective in failing to impeach prosecution witness Keyshla Rivera with Facebook messages she allegedly sent to Appellant's friend, Steven Ortiz, that purportedly contradict her identification of Appellant as the shooter. Further, Appellant contends that trial counsel should have called Ortiz at trial to testify to this communication for the purposes of authentication.

Appellant's trial counsel indicated that, before Appellant's first trial, one of Appellant's family members provided trial counsel with a computer printout

of a private message conversation that allegedly occurred between Ortiz and a social media account in the name of "Keyshiaa Marie Riveraa." N.T., Trial, 7/18/13, at 9-10; N.T., PCRA hearing, 3/8/19, at 13-18. After trial counsel shared this information with the trial court at Appellant's first trial, the trial court questioned the authenticity of the messages. N.T. Trial, 7/17/13, at 10-11, N.T., Trial, 7/18/13, at 11-16.

At the PCRA hearing, in this case, trial counsel admitted that he did not impeach Keyshla with the electronic messages at either of Appellant's trials. Trial counsel admitted that he was uncertain about whether he could authenticate the printout as a conversation between Ortiz and Keyshla as there was nothing on the document to indicate it was a Facebook message. N.T., PCRA hearing, 3/8/19, at 19, 24-25. Trial counsel explained that at the time of trial, he contacted Facebook's security department to retrieve the messages, but did not follow through with this task. N.T., PCRA hearing, 3/8/19, at 9-10. PCRA counsel claimed that the parties recently attempted to retrieve the private messages through a formal request to Facebook, but were unsuccessful. N.T., PCRA hearing, 6/21/19, at 6-10. Further, trial counsel explained that he did not call Ortiz as a witness at trial as he did not have his contact information and felt Ortiz would be uncooperative. N.T., Trial, 7/18/13, at 9-10; N.T., PCRA hearing, 3/8/19, at 20.

While it appears that Appellant admitted a photocopy of the messages at the PCRA hearing as an exhibit, this document does not appear in the

certified record.[3]  The PCRA court permitted PCRA counsel to read a portion of the messages allegedly sent by Rivera to Ortiz into the record when questioning Appellant's trial counsel:

> [PCRA counsel:] And you go down towards the bottom where there is a response from Keyshiaa Mariee Riveraa, it starts "Ryte," but it's spelled R Y T E, you see where I am?
>
> [Trial counsel:] "Ryte, but he knows."
>
> [PCRA counsel:] What's written there says, "Ryte, but he knows who did it, THWHD, he ain't saying shyt," spelled SHYT, "like I would love too help him,"  I'm sorry, "like I would love too," TOO, "help him, RS, but his not saying who did like.  If he want get out, he gotta," and there's a bunch of typos here, "talk, Steven.  And I promise yal with my two lil anquels up in the sky that I would help him ND, were is he at for I can talk to him."
>
> I know I didn't read that exactly correctly, because there are a bunch of typos, but you agree with me that in these messages between Ms. Rivera and Mr. Ortiz, at least it purports to show that Ms. Rivera was telling Mr. Ortiz that [Appellant] was not involved in the shooting, but knew who did it?
>
> [Prosecutor:] Objection.
>
> [Trial court:] Overruled.
>
> [Trial counsel:] I would agree that it appears to say that on this document.  However, I'm uncertain as to whether this was actually a conversation between Keysh[l]a and Ortiz.  I mean the whole problem with this document was that I couldn't authenticate it.

N.T., PCRA hearing, 3/8/19, at 18-19.

_____

[3] We acknowledge that "[t]his Court cannot meaningfully review claims raised on appeal unless we are provided with a full and complete certified record." *Commonwealth v. Miller*, 212 A.3d 1114, 1127 (Pa.Super. 2019).  However, as we conclude *infra* that Appellant has not shown he was prejudiced by trial counsel's failure to impeach Rivera with this document, we did not seek to locate the document or inquire as to why the document was not included in the certified record.

When reviewing the record in this case, we find that, even assuming *arguendo* that trial counsel could have authenticated and admitted the private Facebook messages to impeach Rivera, Appellant has not shown prejudice, to the effect that there was a reasonable probability of a different outcome at trial if not for counsel's error. **See Selenski**, **supra**. Rivera unequivocally testified at trial that Appellant was the individual wearing a black hoodie that shot her brother. Rivera recalled that Appellant was with a bald-headed individual in a red truck. Rivera confirmed that she was "sure" about her identification. N.T. Trial, 12/16/13, at 150-53; N.T. Trial, 12/17/13, at 100-103, 115-16, 128-29.

Further, Rivera's testimony was corroborated by multiple eyewitnesses. Angel Figueroa testified that on the night of the shooting, Appellant had initiated a fight at the Puerto Rican Parade. Further, Figueroa indicated that he conversed with Appellant near the corner of 5th and Cambria Streets after this fight. Appellant was wearing all black, including a black hoodie, appeared to be carrying a gun under his clothing, and was accompanied by a bald individual. Appellant told Figueroa that he returned to the scene to find the boy who he had fought with earlier. N.T. Trial, 12/17/13, at 157-173.

Several minutes later after Figueroa had walked away from Appellant, Figueroa heard gunshots, causing him to look to the corner and see Appellant shooting. N.T. Trial, 12/17/13, at 172-73. While Figueroa admitted he did not see the shooter's face, he knew the shooter was Appellant as he was the only individual was wearing all black clothing and the shooter was standing in

the nearly the same spot that Appellant had conversed with Figueroa minutes earlier. N.T. Trial, 12/17/13, at 173-82.

Saul Rodriguez gave the police a statement admitting that he was the individual that Appellant had punched at the Puerto Rican Parade. Shortly after this altercation, Rodriguez told Appellant's friend, a bald man in a red truck, that he wanted to fight Appellant. The bald man in the red truck indicated that Rodriguez would have to fight him instead of Appellant. N.T., 12/17/13, at 224-25. While the men did not meet up again, Rodriguez indicated that he was in a vehicle when the shooting began. Rodriguez observed Appellant, who was wearing a black hoodie, standing at the corner of 5th and Cambria Streets. N.T. Trial, 12/17/13, at 227-28.

Further, Angel Ducvo gave a written signed statement to the police in which he confirmed that Appellant had fought with Rodriguez at the Puerto Rican Parade. He also recalled that a bald man in a red Ford pickup truck threatened to fight Rodriguez for Appellant. N.T. Trial, 12/17/13, at 88-90. Ducvo admitted he did not see the shooter's face but noted that the shooter was the same size and height as Appellant and was wearing the same clothes, including a black hoodie. N.T. Trial, 12/17/13, at 97, 266-72.

As noted above, officers apprehended John Perez, a bald-headed individual, driving a burgundy Ford F-150 pickup truck, shortly after the shooting. Keyshla Rivera identified Perez as the man she saw with Appellant before the shooting. N.T. Trial, 12/17/13, at 91, 103-110. Officers recovered a Glock 9mm handgun in a hidden compartment on the right side of the front

- 10 -

dashboard of Perez's vehicle that was determined to be the murder weapon by a ballistics expert. N.T. Trial, 12/18/13, at 208.

Given the overwhelming evidence of Appellant's guilt, we conclude that Appellant failed to show that he was prejudiced by trial counsel's failure to impeach Keyshla Rivera with the electronic messages in question, such that the result of his trial would have been different. As such, we affirm the PCRA court's decision dismissing Appellant's petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/11/21